UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | | |
|---|---|---|
| NATHAN PAUL HANNA, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-443 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| JANETTE PRICE, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner is serving a nonparolable term of life imprisonment and a consecutive  term of two years, imposed by the Chippewa County Circuit Court on August 3, 1999, after a jury convicted Petitioner of first-degree murder, MICH. COMP. LAWS § 750.316a, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  In his *pro se* petition, Petitioner raises four grounds for relief, as follows:

I.      THE STATE COURTS DEPRIVED MR. HANNA OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS WHERE THEY DECIDED THAT MR. HANNA KNOWINGLY AND INTELLIGENTLY WAIVED HIS *MIRANDA* RIGHTS AND MADE VOLUNTARY STATEMENTS TO THE POLICE.

II.     MR. HANNA'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS WAS VIOLATED WHERE THERE WAS NO COMPETENT EVIDENCE OF SANITY PRESENTED AT TRIAL AND THE PROSECUTOR FAILED TO REBUT THE INSANITY EVIDENCE PRESENTED.

III.    MR. HANNA'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS WAS VIOLATED WHERE THE PROSECUTION ENGAGED

IN REPEATED MISCONDUCT DURING TRIAL AND CLOSING
ARGUMENT.

IV.     MR. HANNA WAS DEPRIVED OF HIS FEDERAL CONSTITUTIONAL
RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE
DEFENSE COUNSEL FAILED TO OBJECT TO THE PROSECUTOR'S
MISCONDUCT DURING TRIAL.

Respondent has filed an answer to the petition (docket #17) stating that the grounds should be denied
because they have no merit. Upon review and applying the AEDPA standards, I recommend that the
petition be granted.

## PROPOSED FINDINGS OF FACT

### Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from the fatal shooting of Tony Gillespie, the circulation
manager of the Sault Sainte Marie *Evening News*, by Nathan Hanna, a newspaper carrier, on July 23,
1998. Petitioner was charged with one count of open murder and one count of possession of a
firearm during the commission of a felony. Following a preliminary examination on January 22,
1999, Petitioner was bound over on both charges. He was tried before a jury beginning June 23,
1999, and concluding on June 28, 1999.   The only contested issue at trial was the defense of
insanity.[1]

The prosecution proved beyond any doubt that petitioner killed Mr. Gillespie by
shooting him twice with a shotgun. A number of witnesses established the homicide, without
significant contradiction. For example, Richard William Beadle, the advertising manager at the

[1] This summary of the trial proceedings focuses only on the proofs relevant to sanity and to the voluntariness
of Petitioner's *Miranda* waiver and omits discussion of witnesses and evidence relevant only to other issues.

*Evening News*, testified that on July 23, 1998, he arrived at work at 8:00 a.m.  He saw Mr. Gillespie at that time and sat at his own desk, which was about 20-25 feet away from Gillespie's desk.  (Tr. I, 74, 77-78.)  He saw Petitioner, a subcontractor motor route driver, arrive at the *Evening News* offices at about 9:15 a.m.  (Tr. I, 80-81.)  Petitioner was carrying a 12-gauge pump shotgun in an upright and inoffensive position.  (Tr. I, 82-83.)  Beadle assumed Petitioner was intending to show a new gun to Gillespie.  (Tr. I, 83.)  Petitioner and Gillespie conversed quietly and appeared to be admiring the new gun.  (Tr. I, 84.)  Beadle returned to his work and after some minutes, while he was making some copies next to his desk, he heard the shotgun blast.  (Tr. I, 84.)  Beadle turned immediately and saw Gillespie falling to the ground, with his face shot.  (Tr. I, 85.)  Petitioner looked at Beadle and then at Penny Joss. Then he racked the gun and fired again at Gillespie as he lay on the floor.  (Tr. I, 86-87.)  After the second shot, Petitioner slowly and deliberately walked toward the front of the building.  Beadle called 911.  (Tr. I, 87.)  Beadle did not see Petitioner leave the building, and he did not hear the front door slam.  (Tr. I, 88.)

Prosecution witnesses Penny Lynn Joss, Diane Glaz, Howard Kaiser, Jack Storey, Ken Fazzari, and Wayne Link (all employees of the Evening News) corroborated and amplified Beadle's testimony concerning the homicide.

The only defense presented was insanity.  During the Prosecution's case, several witnesses testified concerning the lack of apparent motive for the killing and Petitioner's delusional mental state in the preceding days.  Howard Kaiser testified that, as far as he knew, Gillespie and Petitioner had only a casual relationship.  Gillespie and Kaiser both smoked, and they often would have a cigarette together after lunch outside the back door, where the drivers would pick up their papers. (Tr. I, 117.)  Similarly, Jack Storey, a newspaper reporter for the *Evening News*, testified that

on the day of the shooting he first saw Petitioner at about 8:25 a.m. in the rear stairway area. (Tr. I, 120.) They exchanged hellos as they were leaving the building together. Petitioner went to his pickup truck, which was parked about five feet from the back door. (Tr. I, 121.) Storey testified that Petitioner appeared to be his normal, friendly self. (Tr. I, 124.) Storey was back in the building when the shots were fired. At the time, he did not know what had happened, he heard only an explosion. A few seconds later, he heard another shot. At that point, he and the others around him moved quickly toward the door. (Tr. I, 122.) They went to the dark room and remained there until released by the SWAT team. (Tr. I, 123.) Storey testified on cross-examination that about three weeks before the shooting, Petitioner began to carry on about his unusual religious beliefs, approaching whoever was standing nearby. (Tr. I, 125.) Also, Wayne Link, a press man, testified that Petitioner had had a number of conversations with Gillespie regarding his somewhat unusual religious beliefs. He also testified that Petitioner also had become involved with Amway, but at some point became negative toward the company. (Tr. I, 134-35.)

James McCuaig, the production manager at the *Evening News*, testified that, the day before the shooting, Petitioner met with McCuaig and Gillespie to discuss delivery of a special report. After the meeting ended, Petitioner left, but returned to McCuaig's office shortly thereafter. Petitioner asked Gillespie why he always printed the names of terrorists or hostages in the paper. Gillespie asked Petitioner what he meant. Petitioner responded that Gillespie never put the names of hostages in the paper when writing that type of article. Again Gillespie asked what he was talking about. After a pause, Petitioner asked Gillespie why he wanted to "kick Petitioner in the balls or rip his balls." Gillespie replied that he had never said that and asked when the event supposedly occurred. Petitioner said it had happened a couple of years before. McCuaig joked that Petitioner

probably had misdelivered and Gillespie was giving him heck. Petitioner left the office. (Tr. I, 142-43.) McCuaig asked Gillespie what the conversation had been about. Gillespie responded that it was a strange conversation. (Tr. I, 143.)

Chippewa County Sheriff's Deputy Daniel Kinnear testified that, three days after the shooting, on July 26, 1998, he received a call from the dispatcher to go to Baker Road to investigate a possible sighting of Petitioner with a shotgun. (Tr. II, 179.) He requested that State Police Troopers Andrea Kinnear and Kathryn Hansz accompany him as backup. (Tr. II, 180.) As he traveled down Baker Road, he saw Petitioner walking down the road about a half mile ahead. (Tr. II, 180.) Deputy Kinnear radioed the other law enforcement officers that he would approach in his car until he could determine if Petitioner was carrying a gun. As he approached, he saw a long gun in Petitioner's left hand. He stopped, backed up to get away from nearby houses, and parked his car in an angled position in the road. (Tr. II, 182.) He asked Trooper Andrea Kinnear to use her vehicle PA system to address Petitioner, since his system was not very effective. Trooper Kinnear directed Petitioner to stop and put down the weapon. Deputy Kinnear got behind his vehicle and pointed his shotgun. He ordered Petitioner to stop and put down his weapon. Petitioner continued to walk toward the officers. (Tr. II, 183.) He was at that time 50 yards from the officers. (Tr. II, 184.) The commands to stop were repeated, but Petitioner acted as if he did not hear, continuing to walk with his head down. (Tr. II, 184.) When he was approximately 20 feet from Deputy Kinnear, Petitioner finally turned to look at him. He had been murmuring unintelligibly, and when he turned, he placed his right hand on the forward part of the shotgun and raised it to waist height. Interpreting the movement as hostile, the officers all discharged their weapons, striking Petitioner. (Tr. II, 186.) Deputy Kinnear approached as soon as Petitioner went down. Petitioner was still fumbling with the

- 5 -

shotgun, which Kinnear kicked away.  He informed Petitioner he was under arrest for murder and instructed him to lie still.  Petitioner was bleeding from several wounds.  An ambulance came to transport Petitioner to the hospital.  (Tr. I, 186-87.)

Sault Sainte Marie Police Detective Michael Whitney testified as the chief investigating officer on the case.  (Tr. II, 213.)  Whitney described the course of the investigation. (Tr. II, 217.)  On July 26, 1998, he received a telephone call at home advising him that Petitioner had been apprehended and was transported to War Memorial Hospital.  (Tr. II, 217.)  He was at the hospital when Petitioner arrived by ambulance.  (Tr. II, 217.)  Whitney remained in contact with the hospital, monitoring Petitioner's condition.  (Tr. II, 218.)  On July 28, he and Detective Sergeant Price interviewed Petitioner in his hospital room in the intensive care unit.  (Tr. II, 218.)  Before the interview, he had spoken with the attending nurses to determine Petitioner's condition, whether he was coherent, whether his medication affected his judgment, and if he was able to speak.  (Tr. II, 219.)  The nurse responded that she needed to change the IV before they could interview Petitioner. (Tr. II, 219.)  Whitney interviewed Petitioner after reading him his Miranda rights and tape recorded the interview.  (Tr. II, 220.)

The interview, which had been the subject of a motion to suppress, was played before the jury. (Tr. II, 222-44.)  In response to questioning about what happened the day of the shooting, Petitioner told the detectives that the event had started three months earlier when he got involved in Amway and listened to their tapes.  According to Petitioner, the tapes contained subliminal messages:

Q      What were they saying?

A        They were saying, like I said, bondage and putting people in slavery and for sexual – people getting – okay, and then they loaded up and then they would get in debt to these people and then they would turn around and these people would take them over to a place across the sea where the main islands are over there.  Then once they got them over there they had no rights as a citizen of the United States so they – then they turned them into bond slaves.  Then they come back here.  There are people back here that was already set up that if they got out of line or something they would work like the Mafia and they kill them if they didn't do what they did.

(Tr. II, 223-24.)  Following this response, the detectives, apparently concerned about Petitioner's competence, asked him a series of questions, such as his name, address, date of birth, etc., as well as his awareness of where he was and what day it was.  Petitioner answered all questions.  (Tr. II, 224-25.)  The detectives then asked Petitioner what had provoked the incident on July 23.  Petitioner responded that he had been close friends with Gillespie since he began at the paper three years before.  He claimed to have had a revelation from God that Gillespie was the Anti-Christ:

Q        And what would that mean?

A        That means he is – he is the one that – he is the one that is coming to this earth to – to bring tribulation to the earth.

Q        Would that be considered a savior or something evil?

A.       No, something evil.

Q        Okay.  When were you told that?

A        I was just reading it in the Bible.

Q        Do you know what day you read it in the Bible?

A        I am not sure.

Q        Okay.

A        You know, like I say, I had dreams at night about it and I read it in the Bible and Jesus, the name Jesus. He is the Anti-Christ.  Jesus is the Anti-Christ.

(Tr. II, 227-28.)  Petitioner then answered a number of questions about his purchase of the shotgun. Petitioner stated that he bought it earlier the same week at Wal-Mart.  The gun was for shooting skeet.  He was not sure why he bought the gun because he had another just like it that he had owned for five or six years.  (Tr. II, 228-29.)  Petitioner told the detectives that, on the morning of the shooting, he went to the NAPA auto parts store early in the morning.  When the store did not have the spark plugs he was looking for, he went home and got the gun. (Tr. II, 228, 230.) Petitioner also got a box of ammunition that was sitting on his stereo cabinet.  The box contained a mix of shells, some loaded with buck shot and some with slugs.  (Tr. II, 231.)  He left the house at approximately 8:45 a.m. and drove to the *Evening News* office.  He went upstairs to find Tony by his desk:

Q      Once you get there what happens then?

A      I take the gun inside and I say:  Tony, do you got that list?

                              . . .

Q      What list are you referring to?

A      For his bond slaves.  His slave of people.  His people in slavery.

Q      You had talked to Tony before about this?

A      Yeah, he said he could read in between the lines of the newspapers, see he could read between the lines of the newspapers and TV Guides and all that stuff, and it tells you about what's happening in the world, I mean bondage and sexual slavery that is going on.

Q      When you walked in and asked for the list what did Tony say?

A      He said, no, he didn't have it.

Q      Okay.  Anything else said between you and Tony?

A      Huh.  After that I said I think it is judgment day and I shot him.

. . .

Q    Can you go through the series of the shooting?  Do you remember?

A    Yeah, I walked in and I told him what I had told you.  I said I wanted that list
     with people's names and stuff and of these people that are being sexually held
     captive and stuff like that.  And he said:  What are you doing with that
     shotgun?  And I said:  Well, I need to know the list of these names.  I said:
     These people are being hurt and nobody wants to open their mouths about it
     to find out who they are.  And he sees I have the shells in my hand and he
     reached to grab for them and I said:  Nope and –

. . .

Q    And if you killed him, what would happen?

A    I figured a transformation would come and seven thousand of the lost spirits
     would die automatically that are holding these people in this slavery stuff.

Q    Okay.  After you shot Tony did you think he was dead?

A    Well, I shot the first time.  No, because he tried to get up and I said I ain't
     letting you up.  Also – I found out with reading the Bible was that Christ will
     arise in three days.  In three days you become a zombie if you are put on this
     earth, and like when you enter his tomb his body was gone also along with his
     spirit so there was a zombie walking around on this earth yesterday, too.

(Tr. II, 232-35.)  Petitioner told the detectives that, after shooting Gillespie, he left the building the

same way he came in and drove to the underpass bridge, under the International Bridge.

Q    Okay.  And what did you do once you got to the underpass?

A    I got out.  I kept saying what the heck happened?  I can't believe I did that.

Q    Do you think what you did was wrong?

A    I really can't say because, like I say, to me it was a revelation from God.  I am
     serious.  This is what –

Q    Do you thing what you did is against the law?

A    Oh, yeah, definitely.

- 9 -

(Tr. II, 235-36.)  Petitioner stated that he had stayed at the underpass for about 20 minutes and then had driven out of town toward Five and a Half Mile Road.  He knew he had parked the truck, but he didn't know where.  Once he had parked, Petitioner did not subsequently move the truck.  He took off running into the woods.  (Tr. II, 236-37.)  He stayed in the woods and slept on the ground.  He did not have anything to eat or drink for three days.  (Tr. 237-38.)  He stated:

> A    . . . I sat out there for three days waiting for a revelation from God, for Him to tell me what to do next.

> Q    Did he talk to you at all in those three days?

> A    Yeah, that is what he said.  He said:  Go home.  You know how Jesus would walk through the crowd and the Jews he was close to visibly, like he could walk through the crowd.

> Q    When your truck was located it appeared you kind of hid the truck in the woods.  Did you want to hide it so no one would find it?

> A    I don't know.

> > . . .

> Q    Do you have any intention of hurting anyone else?

> A    No, I do not.  I mean, Tony, he was – he was my boss.  Man, this guy gave me good money, good pay, and everything else.  But it came down he was the Anti-Christ and he had to go or it is coming this way.

> Q    If you had not killed Tony, what would have happened?

> A    What is coming now.  I see in my visions that right now the women are getting in control and what happens is they are killing off the white men and after they kill off all the white men, mainly the Indians and blacks and they teach you this in the church, they are just killing off the white men and women.  The blacks come over from Africa and cannibals and stuff like that and they sneaked over here and are making their way up to the United States.

- 10 -

(Tr. II, 238-40.)  The detectives questioned Petitioner about his understanding of the wrongfulness of his acts:

Q      Was it your intention when you were out in the woods to – obviously you felt that, you know, you did something wrong because you said when you were underneath the International Bridge, you said you couldn't believe you did that.

A      Yeah.

Q      Okay.  So then you said you drove out to the woods and parked your truck. You were trying to avoid detection by the police; is that right?

A      You probably could say that, yeah, till I got a revelation from God to see what I was supposed to do next.

Q      You felt like you knew you done something wrong, that was illegal?

A      I knew I did something wrong.  I knew I did something bad.  I was like, what the hell did I do now?

Q      So you were hiding in the woods?

A      Hiding out in the woods.  I was waiting on – like I say, I was sitting out there waiting for God to –

Q      Is that why you didn't contact your wife or your family?

A      Yep, I didn't contact until I was told.  I was going to die out there.  I was going to die out there from starvation and thirst . . . .

(Tr. II, 241-42.)  Detective Price then asked Petitioner if he remembered meeting with Tony and Wayne McCuaig in the days preceding the shooting.

Q      Okay.  Do you remember saying something to the effect of:  Tony, why did you want to rip my balls off?

A      Yeah, he said something like that about a year ago and I asked him, I said: Why would you want to do something like that for?  And he didn't say any more.  And what I get in the Bible, the fallen angels that fell with Satan, when they come down to this earth that's what he was turning into women because

- 11 -

he cuts their – because men are the ones that go to heaven.  He cuts their sacks off and made women out of them and placed their rib back in.

Q        So were you mad at Tony at all when you shot him?

A        No, I was not mad at all at Tony.

Q        You were not mad?

A        Not a bit.  I thought he was the Anti-Christ and he had to be done away with.

Q        Do you still think he is the Anti-Christ?

A        Well, you know, I really can't say that.  I don't know.  I mean, no man, no man ever told me what to do.  I mean this actually spiritually came into my mind what to do and, you know, and that is why I did it.  Like I said, Tony and I were buds.

Q        You were close?

A        We were close.

(Tr. II, 243-44.)  Detective Whitney testified that at all times Petitioner was responsive to the questions and coherent in his answers, and, during the course of the interview, Petitioner never indicated that he did not understand a question.  (Tr. II, 246.)  On cross-examination, Whitney testified that he knew Petitioner had serious injuries.  He could see three wounds, one to the right leg, one to the left side, under the arm, and a wound in the front of the abdomen lower down.  (Tr. II, 248.)  Whitney did not speak to a doctor or look at the medication sheet before the interview.  (Tr. II, 248-49.)  He merely asked the nurses if Petitioner was able to speak, if the medications would affect his judgment or his ability to talk.  They told him no.  (Tr. II, 249.)  In addition, Whitney acknowledged that, while Petitioner had answered some questions affirmatively suggesting that he had fired at the officers in the road, no shots were fired by Petitioner.  (Tr. II, 252.)

- 12 -

Detective Judd Price testified that he accompanied Whitney to Petitioner's hospital room and participated in the interrogation. He described Petitioner as responsive and not apparently confused, and he testified that Petitioner denied being in pain. (Tr. II, 263-64.)

Detective Sergeant Robin Sexton testified that he assisted in the interviews at the *Evening News* building and also was in charge of investigating the subsequent shooting scene when Petitioner was arrested. (Tr. II, 268-69.) Two days after Petitioner was shot, Sexton interviewed him in the intensive care unit. Sexton testified that Petitioner was in obvious discomfort, but was articulate and responsive to questions. (Tr. II, 270.) He interviewed Petitioner for between ten and fifteen minutes, and he taped the interview. (Tr. II, 270-71.) The nurse came in several times during the interview to tend to a medical alarm that kept going off. (Tr. II, 271.) The tape was played to the jury. (Tr. II, 273.) In sum, Sexton asked Petitioner about whether he was trying to hurt the officers who arrested him. He stated that the only person he was trying to hurt was the Anti-Christ, Tony Gillespie. Petitioner told Sexton the he had purchased the new weapon because the other gun had a broken firing pin. He also told Sexton that he had remained in the woods after the shooting because he was waiting for a revelation from God to tell him what to do. God ultimately told him to walk down the road. (Tr. II, 278.)

After the tape was played, the prosecutor asked Sexton whether the interview was terminated by the arrival of counsel. Sexton responded that, after counsel arrived and spoke with Petitioner, Sexton asked if Petitioner wished to continue. Petitioner replied that with the advice of counsel he would not. (Tr. II, 273.) Apparently referring to Petitioner's understanding of counsel's advice, the prosecutor then asked, "He was aware of that, anyway?" Sexton responded, "Yes." (Tr. II, 273.) On cross-examination, Sexton acknowledged that when he asked Petitioner why he had

- 13 -

spun around on the officer in the road, Petitioner stated that he was just going to tell the officers that he was going to walk down the road and that he had the gun because he was taking it home. Petitioner also told Sexton that God had told him to walk down the road and go home. The evidence showed that Petitioner never fired his gun at the officers. (Tr. II, 283.) The prosecution rested its case. (Tr. II, 284.)

Dr. Anthony Holzang, a staff psychiatrist at Marquette General Hospital, testified for the defense. (Tr. II, 288.) Dr. Holzang was qualified as an expert in the field of psychiatry. (Tr. II, 291.) Dr. Holzang testified that he was covering inpatient service at the Marquette psychiatric unit when Petitioner was transferred from War Memorial Hospital. (Tr. II, 291.) Before speaking with Petitioner, Holzang had reviewed a psychiatric report by Dr. William Watts from War Memorial Hospital, who reported that Petitioner had begun reading the Bible and listening to religious tapes approximately seven or eight months before the shooting. Petitioner began to have thoughts that people would kill him. Petitioner's wife became alarmed. Petitioner thereafter returned to a fairly normal state, until about four to six months before the shooting, when he became "overly religious" again. Petitioner told his wife that he suspected Gillespie was the Anti-Christ. (Tr. 292-93.) Holzang spent about 40 or 50 minutes speaking with Petitioner. Petitioner claimed that he came to see that he was one of God's elect and that he had received instructions from God through a variety of means, including the Bible, watching TV, listening to the radio, and reading magazines. (Tr. II, 293-94.) His speech was symptomatic of a psychotic disorder, which Holzang initially diagnosed as a psychosis affective disorder. (Tr. II, 294, 297.) Holzang testified that Petitioner was cooperative and seemingly calm and happy. Petitioner discussed the murder in a matter-of-fact fashion and seemed coherent. (Tr.11, 294.) Petitioner told Holzang about his notions that Jesus

- 14 -

really was the Anti-Christ, and that Petitioner's relationship with Gillespie was like Abel to Cain. (Tr. II, 295.)  Petitioner told Holzang that after he shot Gillespie, he went to the forest to await a message from God to tell him what to do next.  After three days, he received a message to go back into town and fear nobody, neither man nor beast.  Petitioner expressed his surprise that the officers shot at him.  Although they had told him to stop, God had told him to keep walking, and then he got shot.  (Tr. II, 296.)  Holzang reported that after his initial consultation with Petitioner, he saw him the next day, and then care was turned over to Dr. Cappuccio.  (Tr. II, 296.)  Petitioner refused to take psychotropic medications initially because he did not believe he was mentally ill.  (Tr. II, 296-97.)

Dr. Carol Cappuccio was Petitioner's treating psychiatrist at Marquette General Hospital.  She saw Petitioner for about 45 minutes the first day, and then saw him a total of 20 or 21 times during his stay.  (Tr. II, 306.)  She was certified by the court as an expert in the field of psychiatry.  (Tr. II, 304.)  She examined Petitioner and reviewed the records compiled by Dr. Holzang, as well as the physicians at War Memorial Hospital.  She concluded that Petitioner was psychotic, suffering delusions that God had given him a message to kill Gillespie.  He felt obligated to act and felt that, in killing Gillespie, he had done something important.  He believed he had been given a special job by God and that he had to do it in order to save both himself and his family. (Tr. II, 305-06.)  Petitioner denied to her that he was mentally ill and refused to take the medications ordered because he felt he would be betraying his beliefs in God by demonstrating a lack of faith in the given mission.  He had no insight into the fact that he was delusional or that what he did was wrong.  (Tr. II, 306.)  Petitioner stated that Gillespie had told him that he was the Anti-Christ. (Tr. II, 306.)  Petitioner was proud that he had killed the Anti-Christ.  (Tr. II, 307.)  About ten days

after Petitioner began taking his medications, he began to become depressed as he realized what reality was.  By the time he left Marquette General Hospital, he was not yet developing full insight into what he had done, but he was spending more time thinking he might have a mental illness. (Tr. II, 308.)  He had expected a Second Coming before he left the hospital, and when it did not arrive, he could not understand what he had done wrong.  He began to worry about whether he was right, and what effect it might have on his own and Gillespie's families.  (Tr. II, 308.)

Next, the videotape of the testimony of Dr. Craig Lemmen, a psychiatrist with the Michigan Center for Forensic Psychiatry,[2] was played for the jury.  (Tr. II, 311.)  Lemmen was qualified as an expert in psychiatry and forensic psychiatry.  (Lemmen dep., 8.)  Dr. Lemmen defined schizophrenia and distinguished between hallucinations and delusions, which are fixed false beliefs. (Lemmen dep., 10.)  Persons suffering from the delusions of schizophrenia misinterpret the things that are going on around them and reach unrealistic and erroneous conclusions.  (Tr. II, 12.) Lemmen testified that Petitioner was admitted to the Forensic Center on September 4, 1998 for evaluation and treatment so that he could eventually stand trial.  (Lemmen dep., 14-15.)  Lemmen met with him the first time on September 8, 1998.  (Lemmen dep., 13.)  Before meeting with Petitioner, Lemmen reviewed police reports, medical records from both War Memorial Hospital and Marquette General Hospital.  (Lemmen dep., 13.)  Lemmen also conducted a full psychiatric examination, took a complete history, and ordered a physical examination and medical evaluation. (Lemmen dep., 13-14, 15.)  After evaluation, Petitioner was observed for three months, and Dr. Dravis, a University of Michigan resident, did most of the psychotherapy.  (Lemmen dep., 14-15.)

---

[2] The Michigan Center for Forensic Psychiatry is a state-run psychiatric facility providing diagnostic services to the Michigan courts on issues of competency, criminal responsibility, and diminished capacity.

Petitioner showed no sign of having ingested any substance to make him become psychotic. (Lemmen dep., 15.)  Staff at the Forensic Center are very experienced in determining whether a patient is mentally ill or trying to fake symptoms.  No one on the staff ever suggested that Petitioner was malingering.  (Lemmen dep., 16.)  Petitioner was diagnosed with either a delusional disorder or schizophrenia.  (Lemmen dep., 17.)  Lemmen testified that, although a schizophrenic who is delusional may be legally insane, he may be well aware of what the law is.  However, a person in that condition could not appreciate the wrongfulness of his conduct.  In his or her own mind, he is doing the right thing in terms of his beliefs.  (Lemmen dep., 19.)

Petitioner's wife, Rula Hanna, took the stand.  (Tr. III, 314.)  She testified that, before the incidents leading up to the shooting, Petitioner was a friendly, family man.  (Tr. III, 318-19.)  At some point the preceding year, Petitioner began to act strangely.  (Tr. III, 315)  He read the Bible for several hours each day, and began to talk about unusual things, such as his idea that Jesus was black and that persons repairing the bridges were actually planting bombs.  (Tr. III, 315-16.)  He began talking about the world coming to an end, and he paced around the yard.  (Tr. III, 316.)  Petitioner also began to get involved in Amway, and he listened to the company tapes.  (Tr. III, 317.)  He began to talk about Amway taking people to another country and doing sexual things.  (Tr. III, 318.)  Petitioner burned all of his Amway tapes.  (Tr. III, 317.)  Petitioner never expressed any anger toward Gillespie; Gillespie was Petitioner's best friend.  (Tr. III, 319.)

Dr. Robert B. Mogy testified as a licensed clinical psychologist and certified consulting forensic examiner employed by the Michigan Center for Forensic Psychiatry.  (Tr. III, 333.)  Mogy testified that he had been ordered by the Chippewa County Circuit Court to examine Petitioner in regard to his legal status in the case, both as to competency to stand trial and as to

- 17 -

criminal responsibility. (Tr. III, 339, 344.) Mogy initially deferred the criminal responsibility examination and addressed only competency. (Tr. III, 343.) He saw Petitioner two or three times at Marquette General Hospital to evaluate his competency and criminal responsibility, and he examined numerous records. (Tr. III, 340, 343.) After Mogy completed his report, he testified in court that Petitioner was not competent to stand trial, and Petitioner was then transferred to the Forensic Center in Ann Arbor for three months, where he was seen predominantly by Drs. Lemmen and Dravis. (Tr. III, 340, 343, 344.) In December 1998, Mogy completed the second portion of his ordered examination, the criminal responsibility examination. (Tr. 344, 348.) Mogy reviewed the records of all the hospitals and all the other examining psychiatrists. (Tr. III, 345.) On December 20, 1998, he examined Petitioner. (Tr. III, 347-48.) Mogy concluded that Petitioner was legally insane. (Tr. III, 348.) In order to be legally insane, the person must be mentally ill and must lack the substantial capacity to appreciate the wrongfulness of his conduct or lack the substantial capacity to conform his conduct to the requirements of the law. (Tr. III, 348.)

Mogy testified that the first prong of the test was clearly present. Petitioner was found to be grossly mentally ill by every mental health professional who examined him from the time of the arrest to the time of Mogy's examination. (Tr. III, 349.) Petitioner had developed over the course of a year a set of beliefs that was divorced from reality, including beliefs that Amway was responsible for a kind of sexual bondage or slavery. Petitioner's delusional beliefs clearly demonstrated that he was mentally ill. (Tr. III, 349-50.) Second, Mogy examined whether Petitioner was capable of appreciating the wrongfulness of what he did. Petitioner developed a belief that his best friend was the Anti-Christ. (Tr. III, 350.) Petitioner came to believe that he was an elected person chosen by God, that Gillespie was a threat to Petitioner and his family, and that Gillespie was

- 18 -

in some way holding in sexual slavery seven thousand people who would be released only if Petitioner killed Gillespie. (Tr. III, 351, 354.) In addition, Mogy found no contrary evidence that suggested a possible motivation for the killing other than Petitioner's obvious and serious mental illness. (Tr. III, 353.) Mogy stated that Petitioner's statements to police regarding the wrongfulness of his conduct demonstrated that he understood killing was legally wrong, but that he believed killing the Anti-Christ was not wrong. Mogy examined Petitioner's responses to police officers while he was in the ICU, had been shot three times and was on Demerol, in which he agreed that his conduct was wrong. Mogy pointed out, however, that Petitioner had also agreed to a number of other statements that were now known to be factually wrong, such as the fact that he shot at the officers. (Tr. III, 357.) When asked about the inconsistency of his police statements, Petitioner explained that he had wondered if he was wrong because he had expected the Second Coming after he shot Gillespie, and when it did not happen, Petitioner wondered what was wrong. (Tr. III, 358.) Mogy concluded that, while Petitioner knew that he had done an illegal act, he believed that he was carrying out God's wishes. (Tr. III, 363.) As Petitioner was treated with medication at Marquette General Hospital, he began to have questions about whether he was right, and he became sad because he realized he had killed his best friend for no sensible reason. (Tr. III, 363.) Mogy concluded that Petitioner did not know what he was doing was wrong. (Tr. III, 370.) The defense rested. (Tr. III, 386.)

On rebuttal, the prosecution called no expert witness to opine on Petitioner's sanity, but only called three members of the Gillespie family. The victim's son, Nathan Gillespie, testified that he was acquainted with Petitioner for some months in July 1998 when he worked at the *Evening News* in the circulation department. (Tr. III, 389.) Nathan testified that he was unaware of any

- 19 -

relationship between his father and Petitioner. (Tr. III, 390.) Petitioner had come to their home on

two or three occasions that summer, at least once to sell Amway products. (Tr. III, 392.) According

to Nathan, Petitioner and Tony Gillespie were not friends. (Tr. III, 392.) On cross-examination,

Nathan acknowledged that Petitioner had been to the house at least once with his family. (Tr. III,

393.)

   Dominic Gillespie, another of the victim's sons, testified that he had worked at the

*Evening News* during the summer of 1998 doing a variety of jobs. (Tr. III, 394-95.) Dominic

testified that he became acquainted with Petitioner at that time and spoke with him nearly every day.

(Tr. III, 395.) Dominic frequently was present when his father and Petitioner had conversations, and

on only one occasion did Petitioner discuss religion. (Tr. III, 396.) Dominic never observed any

abnormal behavior by Petitioner. (Tr. III, 397.)

   Anthony Gillespie, a third son of the victim, testified that he had worked at the

*Evening News* from 1992 to 1998. (Tr. III, 398.) He was acquainted with Petitioner since Petitioner

started delivering papers, approximately three years before. Anthony denied that his father had any

relationship with Petitioner outside of work. (Tr. III, 399.) Anthony had conversation with

Petitioner nearly every day, when he would take a break before starting the mail. He had discussed

the Bible with Petitioner on a number of occasions. While they disagreed, it was friendly. (Tr. III,

400.) He never observed any behavior by Petitioner that was alarming. (Tr. III, 400-01.) He never

observed any aggressive behavior by Petitioner. (Tr. III, 401-02.) He never saw Petitioner get out

a Bible and show it to others. (Tr. III, 402.)

   At the conclusion of trial, on June 28, 1999, the jury found Petitioner guilty but

mentally ill of both first-degree murder and felony firearm. (Tr. IV, 458.) Before sentencing,

Petitioner filed a motion for judgment notwithstanding the verdict on the grounds that the prosecution had failed to introduce sufficient evidence, including expert testimony, that contradicted the four opinions for the defense that Petitioner was insane.  On August 3, 1999, the court denied the motion and sentenced Petitioner to serve terms of life imprisonment and two years on the respective convictions.  (Sentencing Transcript, ("S. Tr."), 17, docket #31.)

### B.  Direct Appeal

On August 13, 1999, Petitioner filed a claim of  appeal as of right to the Michigan Court of Appeals.  On January 31, 2000, appellate counsel filed a motion for new trial, arguing the verdict was against the great weight of the evidence and further arguing that the trial was tainted by prosecutorial misconduct, the ineffective assistance of counsel, and cumulative error.  The motion was heard and on April 17, 2000 (Hrg. Tr., docket #31), and an order denying the motion was entered on July 13, 2000.  (Chippewa County Cir. Ct. docket sheet, Docket #20.)  Petitioner's brief on appeal, which was filed by counsel on August 23, 2000, raised seven issues, including the four raised in this application for habeas corpus relief.  (See Def.-Appellant's Br. on Appeal, docket #33.)  By unpublished opinion issued on November 27, 2001, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 11/27/01 Mich. Ct. App. Opinion ("MCOA Op."), docket #33.)

Petitioner, through counsel, filed an application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same seven claims raised before and rejected by the Michigan Court of Appeals.  By order entered October 29, 2002, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be

reviewed. (See Mich. Ord., docket #35.) Petitioner's application for federal habeas corpus relief

was filed in the Eastern District of Michigan on June 20, 2003.

## PROPOSED CONCLUSIONS OF LAW

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.

L. 104-132, 110 STAT. 1214 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has

"drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits

in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme

Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d

at 655. This Court also may not consider decisions of lower federal courts in determining whether

the state decision is contrary to, or an unreasonable application of, clearly established federal law.

*Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is

"limited to an examination of the legal landscape as it would have appeared to the Michigan state

courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential

because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

<u>**Discussion**</u>

I.      <u>Lack of Voluntary, Knowing and Intelligent Waiver of *Miranda* Rights</u>

In his first ground for habeas relief, Petitioner asserts that he was denied his Fifth Amendment rights when the trial court admitted his statements to police after finding that he had voluntarily, knowingly and intelligently waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 458 (1966). Petitioner's claim involves the two statements made to police officers while he was in

- 24 -

the intensive care unit of War Memorial Hospital.  The prossecution relied on those portions of the statements demonstrating his understanding of the wrongfulness of his conduct.  Petitioner argues that, at the time he was interrogated by detectives and made statements, he was in the intensive care unit, only hours after major surgery for three police-inflicted gunshot wounds.  He had tubes in his nose and mouth, was on an IV, had not had anything to eat or drink in four-and-a-half days, was on significant narcotic medication, was suicidal and was extremely mentally ill.

Petitioner filed a motion to suppress his statements.  On March 30, 1999, an evidentiary hearing on the motion to suppress was held pursuant to *People v. Walker*, 132 N.W.2d 87 (Mich. 1965).  At the hearing, Petitioner introduced the testimony of Dr. Robert Mogy, a court-appointed expert in forensic psychology employed by the Center for Forensic Psychiatry.[3]  Mogy testified that he had listened to Petitioner's recorded statement to Officers Whitney and Price, and he had reviewed Petitioner's medical records from War Memorial Hospital, Marquette General Hospital, and Behavioral Mental Health Service in Chippewa County.  He also twice interviewed Petitioner personally.  (3/30/99 Tr., 5.)  Mogy acknowledged that Petitioner had agreed that he understood his *Miranda* rights when detectives read them to him.  (3/30/99 Tr., 6.)  However, Mogy identified serious questions about Petitioner's ability to understand his rights.  Citing examples from the tape in which Petitioner spoke about the anti-Christ, about acting on subliminal messages contained on Amway tapes, and about sexual slavery and bondage, Mogy testified that Petitioner was obviously mentally ill and delusional, even to a layman.  (3/30/99 Tr., 6, 8.)  Petitioner also was on

---

[3]Under Michigan law, once a defendant gives "notice of an intention to assert the defense of insanity, a court shall order the defendant to undergo an examination relating to his or her claim of insanity by personnel of the center for forensic psychiatry or by other qualified personnel, as applicable, for a period not to exceed 60 days from the date of the order.. . . ."  MICH. COMP. LAWS § 768.20a(2).

two kinds of narcotic medications, including Demerol, which resulted in slurred speech.  (3/30/99 Tr., 7.)  In addition, the statement was taken only seven or eight hours after Petitioner underwent surgery, while Petitioner was recovering in ICU.  (3/30/99 Tr., 7.)  Based upon all those factors, Mogy (an employee of the State of Michigan) concluded that Petitioner was not capable of thinking through the decision to answer prior to doing so.  (3/30/99 Tr., 8-9.)

On cross-examination, the prosecutor asked Mogy whether Petitioner's apparent ability to respond to questions indicated that his thought process was in place.  Mogy disagreed. (3/30/99 Tr., 11.)  He testified that the thought processes of delusional individuals are not so disjointed as to prevent coherent responses, but the processes are impaired by the fact that they start with a false framework of understandings or beliefs.  (3/30/99 Tr., 11-12.)  Mogy testified that Petitioner's statements that he knew he had done something wrong were directed to his expectation that the Second Coming of Christ was supposed to have happened, but it did not.  (3/30/99 Tr., 14.)

Nurse Jill Halsey testified that she worked in the intensive care unit at War Memorial Hospital.  (3/30/99 Tr., 18.)  Halsey testified that on the evening of July 27 to July 28, 1998, Petitioner was awake and resting comfortably.  He had a large wound to the left side of his chest, a smaller wound to the left side of his abdomen, and a large brace on his lower right leg.  (3/30/99 Tr., 20-21.)  During the evening, Petitioner at one point attempted to kill himself by holding a pillow over his face, despite the fact that it is not medically possible to commit suicide by this method. (3/30/99 Tr., 22, 29.)  Petitioner stated that he thought the nasal gastric tube had poison in it.  The tube was inserted post-operatively to keep gasses down and prevent vomiting.  (3/30/99 Tr., 23.) Petitioner also had an IV and was receiving Demerol with a patient-controlled pump.  (3/30/99 Tr.,

- 26 -

23-24.)  Petitioner was not allowed to eat or drink anything because of the recent surgery.  (3/30/99

Tr., 26-28.)  Petitioner appeared responsive and aware of his surroundings.  (3/30/99 Tr., 28.)

       Michigan State Police Detective Sergeant Robin Sexton was examined regarding the

statement he took from Petitioner at approximately 1:00 p.m. on July 28, 1998.  (3/30/99 Tr., 30.)

Sexton testified that he advised Petitioner of his *Miranda* rights and Petitioner waived those rights.

Sexton testified that he spoke with Chippewa County Deputy Eagle before entering the room, who

did not advise Sexton that counsel had been appointed.  (3/30/99 Tr., 32.)  Sexton testified that he

learned counsel had been appointed when defense counsel arrived at the hospital during the taking

of the statement.  (3/30/99 Tr., 34.)  When he took the statement, Sexton was investigating the use

of force by police officers, not the shooting of Mr. Gillespie.  (3/30/99 Tr., 35.)  Sexton testified that

when he questioned Petitioner, Petitioner had three gun-shot wounds to his side, stomach and leg

and was uncomfortable, but he appeared coherent and able to talk.  (3/30/99 Tr., 35.)  Sexton denied

telling a nurse to withhold pain medication to facilitate questioning, though a notation in the medical

records stated that medication had been withheld at police request.  (3/30/99 Tr., 36.)

       Sault Sainte Marie Police Detective Michael Whitney testified that he and Detective

Price conducted and taped an interview with Petitioner on July 28, 1998.  (3/30/99 Tr., 37-38.)  At

the time of the interview, Whitney was not aware how long Petitioner had been out of surgery, and

he was not sure what medications he was receiving.  Whitney testified that Petitioner's voice was

so weak that a listener could hear Petitioner's breathing patterns better than his speech.  (3/30/99 Tr.,

39.)  Whitney believed Petitioner had tubes in him, but he was not sure.  He had a brace on his leg

and had been shot three times.  (3/30/99 Tr., 40.)  Whitney testified that he had previously spoken

with doctors and nurses and told them he wanted to speak to Petitioner when he was able to speak,

- 27 -

and he received authorization from the nurse to speak with Petitioner before entering the room. (3/30/99 Tr., 40-41, 42-43.) According to Whitney, Petitioner was responsive and appeared rational, though some of his responses were unusual. (3/30/99 Tr., 43-44.) He testified that Petitioner had talked about spirits and zombies, Amway and the Bible. He acknowledged that he was aware that Petitioner had not eaten or drunk for three days while in the woods. (3/30/99 Tr., 45.)

On April 1, 1999, the trial court denied the motion to suppress, finding that, under the totality of the circumstances, the prosecution had demonstrated that Petitioner had validly waived his rights. (4/1/99 Tr., 6; docket #25.) The trial court first held that Petitioner did not challenge the voluntariness of his confession and no question existed that the confession was voluntary because there was no indication of police misconduct. (4/1/99 Tr., 5-6; docket #25.) The court then concluded that the waiver was knowingly and intelligently made. The court held that the issue of an intelligent waiver depends not on the defendant's ability to understand the full consequences or that the defendant be able to make the best decision. Instead, the question is whether "the decision was made with the full understanding that he need not say anything at all and that he might consult with an attorney if he so desires." (4/1/99 Tr., 7; docket #25.) The court found that Petitioner had been fully informed of his rights and that he never demonstrated any lack of comprehension. The court focused on Petitioner's knowledge of facts concerning his family, home address and who and where he was. (4/1/99 Tr., 8-9; docket #25.) The court further noted that Petitioner understood his relationship to the police because he had been in an altercation with them. Indeed, the court noted, Petitioner acknowledged in his statement that he knew his conduct was illegal. (4/1/99 Tr., 9; docket #25.) The court dismissed the forensic psychologist's opinion that Petitioner was delusional and not competent to waive his rights, saying that "the answers to the questions initiated by the police were

- 28 -

responsive, appropriate. He spoke in a coherent manner, even logical manner based on the fact he was delusional." (4/1/99 Tr., 10; docket #25.) The court found that Petitioner was "oriented to place, person and place, and personal relation to reality." (4/1/99 Tr., 10; docket #25.)

The court of appeals affirmed the trial court's findings. The court noted that Petitioner had not argued at the suppression hearing that his statement was involuntary. Nevertheless, the appeals court did not find the issue procedurally defaulted, but addressed the question on its merits. Regarding the nursing note stating, "Further pain medication held per request of the detective to facilitate communication," the court determined that it did not demonstrate coercion. The court concluded that, even if true, the note would only mean that the detective sought to have Petitioner not be so sedated as to be unable to talk. (MCOA Op. at 9.) The court did not, however, address the other issues of police coercion raised on direct appeal and in this habeas petition, namely that police, in taking the statement were aware of the following: (1) that Petitioner was in the ICU recovering from multiple gunshot wounds and surgery within the past eight hours; (2) that he had tubes in his nose and throat; (3) that he was medicated with Demerol and other drugs; (4) that police officers admitted he was in pain; (5) that he advised officers he had not eaten in three days; (6) that he could barely be heard over the sound of his own breathing; and (7) that his thought processes were sufficiently delusional to make officers inquire into his competence.

The court of appeals also concluded that Petitioner's waiver of his rights was knowing and intelligent. The court analyzed the issues as follows:

> Hanna argues that his mental illness, along with the circumstances of the interviews, precluded him from knowingly and intelligently waiving his rights. He asserts that those circumstances were that he was recently out of surgery, that he was heavily medicated, that he was shackled to his hospital bed, that he was connected to a nasal/gastric tube, and that he had not consumed food or water for over three

days.  However, we observe that these circumstances establish a question of fact concerning whether defendant knowingly and intelligently waived his rights, not a legal conclusion as to such a waiver.

Although mental illness is a factor to consider when deciding whether a suspect knowingly and intelligently waived *Miranda* rights, only in an extreme case does that fact alone decide the issue:

> Conceding that there is a level of mental deficiency so severe that under no circumstances would a defendant be able to knowingly waive his rights, we observe that short of this level of incapacity, a defendant's mental ability of necessity must be only one factor in the "totality of circumstances" inquiry.  To hold otherwise would effectively immunize the mentally limited from interrogation and preclude the socially beneficial use of confessions, despite the absence of any indications of overreaching by the police."[16]

As the trial court noted, a suspect need not have a legally sophisticated understanding of the nuances of this area of the law to give a knowing and intelligent waiver of *Miranda* rights.[17]   Instead, to establish a valid waiver of *Miranda* rights, the prosecution need only show that the suspect understood that he or she did not have to speak, that the suspect had the right to have an attorney present during questioning, and that any statements given could be used against the suspect at trial.[18]  The fact that a jury found Hanna to be guilty but mentally ill does not, in and of itself, mean that he could not knowing and intelligently waive his *Miranda* rights.

Here, all indications are that Hanna spoke appropriately and coherently, not only indicating that he was aware of his circumstances and whereabouts, but stating his understanding and decision to waive, each of his specific *Miranda* rights.  According to the evidence, Hanna was calm and rational, despite revealing very peculiar – and rather irrational – religious beliefs.  Further, the trial court listened to the recordings of the interviews and we are obligated to defer to that trier of fact's superior ability to weigh evidence and assess credibility.[19]  From this record, we conclude that there was a reasonable evidentiary basis for the trial court's finding that Hanna understood that he had the right to remain silent, that he was entitled to have a lawyer present during questioning, and that anything he said could be used against him at trial.

Concerning Hanna's lack of food or water, we observe that this deprivation was a consequence of his decision to go into hiding after his crime.  Although Hanna now wishes to imply that he was further deprived of nutrition and hydration while in the hospital, this belated allegation – that hospital personnel chose to withhold these necessities – strains credulity.  Further, the presence of the nasal/gastric tube

indicates, rather obviously, that Hanna was receiving nourishment through that mechanism.   Thus a consideration of the circumstances surrounding Hanna's confessions does not require any presumption that he was deprived of food or water at the time.

fn.16.   [*People* v] *Cheatham*, [453 Mich App 1, 43; 552 NW2d 355 (1996)] (Boyle, J., joined by Brickley, C.J., and Riley, J., and in pertinent part by Weaver, J.) (citation omitted).

fn.17.   See [*People v*] *Abraham*, [234 Mich App 640, 652 n.7; 599 NW2d 736 (1999)].

fn.18.   *Abraham, supra* at 647, citing *Cheatham, supra* at 29 (Boyle J., joined by Brickley, C.J., and Riley, J., and in pertinent part[] by Weaver, J.).

fn.19.   See *People v Lemmon*, 456 Mich 625, 637; 576 NW2d 129 (1998); *People v Vaughn*, 186 Mich App 376, 380; 465 NW2d 365 (1990).

(MCOA Op. at 9-10.)

*Miranda* rights may be waived if the waiver is voluntary, knowing, and intelligent; that is, the product of free choice rather than intimidation, and with full awareness of the nature of the right being relinquished and the consequences.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *Machacek v Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000); *Miranda*, 384 U.S. at 476.  The Supreme Court has made clear that the inquiry into whether the rights were properly waived has "two distinct dimensions": whether the waiver is voluntary and whether it is knowing and intelligent. *Colorado v. Spring*, 479 U.S. 564, 573 (1987); *North Carolina v. Butler*, 441 U.S. 369 (1979).  The Supreme Court has held that the standard for the voluntariness of a *Miranda* waiver parallels that for a Fourteenth Amendment voluntariness determination.  *See Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986) ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context.").[4]  A court must examine the totality of the circumstances to

_____

[4]Similarly, the Supreme Court has indicated that the standard for voluntariness in the waiver of *Miranda* rights under the Fifth Amendment is the same as that for the waiver of the trial right to counsel under the Sixth Amendment; both standards require knowledge of the rights being given up and specific evidence of the waiver. *See Miranda*, 384

determine whether a proper waiver has occurred. *See Moran*, 475 U.S. at 421; *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004); *Seymour v. Walker*, 224 F.3d 542, 553-54 (6th Cir. 2000). In conducting this test, a court should consider factors such as:

> (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of *Miranda* rights.

*Abela*, 380 F.3d at 928 (citing *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993)). Of these factors, "[c]oercive police activity is a necessary element for finding that the waiver of *Miranda* rights was involuntary." *Id.* (citing *Connelly*, 479 U.S. at 167). The government bears the burden of proving by a preponderance of the evidence that a petitioner has waived his rights. *Abela*, 380 F.3d at 928; *Connelly*, 479 U.S. at 168. The question of voluntariness is a mixed question of fact and law. *Miller v. Fenton*, 474 U.S. 104, 112 (1985) (holding that "state-court determinations concerning the ultimate question of the voluntariness of a confession are not binding in a federal habeas corpus proceeding") (citing *Davis v. North Carolina*, 384 U.S. 737 (1966)). On habeas review, a court must apply the "unreasonable application" prong of § 2254(d)(1) to mixed questions of fact and law. *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003); *Hunt v. Mitchell*, 261 F.3d 575, 580 (6th Cir. 2001).

The physical and mental condition of a suspect is not in and of itself dispositive of an inquiry into voluntariness. *See Connelly*, 479 U.S. at 165 ("[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry."). "Absent police conduct causally related

---

U.S. at 476-78 (relying on *Johnson v. Zerbst*, 304 U.S. 458 (1938) (Sixth Amendment voluntariness inquiry), and *Carnley v. Cochran*, 369 U.S. 506 (1962) (same)).

to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Connelly*, 479 U.S. at 164.

In *Connelly*, the petitioner approached a uniformed police officer and told him that he had murdered someone and wanted to talk about it. When asked by the police officer whether he had been drinking or was taking drugs, Connelly denied both. *Id.* at 160. He acknowledged that he had, in the past, been hospitalized in mental hospitals, but, despite being advised of his rights, he told the officer that he wanted to talk because his conscience had been bothering him. *Id.* He then proceeded to give the police details and pointed out the location of the murder to the officers. *Id.* at 160-61. Connelly gave no indication that he was suffering from any kind of mental illness at the time of the confession. *Id.* at 161. In the morning, after Connelly had been held overnight by the police, he became visibly disoriented while talking with the public defender's office. He began giving confused answers, stating "that 'voices' had told him to come to Denver and that he had followed the directions of these voices in confessing." *Id.* Connelly subsequently was found to be suffering from chronic schizophrenia and was initially held incompetent to stand trial. The Supreme Court held, that, because the police had not engaged in any coercive police activity, the confession could not be found to be involuntary. *Id.* at 166-67.

Nevertheless, the *Connelly* Court expressly reaffirmed the validity of its prior decisions addressing voluntariness. *Id.* at 163-65. As the *Connelly* Court observed, the Supreme Court has on more than one occasion addressed concerns about the physical and mental condition of a suspect and found that, depending on the seriousness of the circumstances, the detective's knowledge of those conditions before questioning may be sufficient to constitute the necessary state action to establish a due process violation. For example, in *Blackburn v. Alabama*, 361 U.S. 199,

- 33 -

207-08 (1960), the Court held that evidence "establish[ing] the strongest possibility that [the petitioner] was insane and incompetent at the time he allegedly confessed . . ." was sufficient to establish a due process violation when considered in light of the eight-hour sustained interrogation in a tiny room filled with police officers, the absence of friends, relatives or legal counsel, and the fact that the deputy sheriff composed the confession language.  The Court reached its decision notwithstanding the fact that the interrogating officers thought the suspect was sane at the time he confessed.  *Id.*; *see also Townsend v. Sain*, 372 U.S. 293, 309 (1963) (noting that Court's finding in *Blackburn* did not depend on officers' stated belief that suspect did not appear insane or incompetent at the time the testimony), *overruled on other grounds by Keeney v. Tomayo-Reyes*, 504 U.S. 1 (1992).  The Court rejected as dispositive the officers' claim that the petitioner appeared sane because he "talked sensible and give [sic] sensible answers," was clear-eyed, and did not appear nervous."  *Blackburn*, 361 U.S. at 204.

Similarly, in *Mincey v. Arizona*, 437 U.S. 385, 399-400 (1978), the Court overturned a state court's determination that a statement taken from a hospitalized suspect was voluntary.  The Court found that police officer's questioning violated due process:

> It is hard to imagine a situation less conducive to the exercise of "a rational intellect and a free will" than Mincey's.  He had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician.  Although he had received some treatment, his condition at the time of Hust's interrogation was still sufficiently serious that he was in the intensive care unit.  He complained to Hust that the pain in his leg was "unbearable."  He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent.  Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus.  He was, in short, "at the complete mercy" of Detective Hust, unable to escape or resist the thrust of Hust's interrogation.

> In this debilitated and helpless condition, Mincey clearly expressed his wish
> not to be interrogated. . . .

*Id.*  In *Mincey,* as in the instant case, the Petitioner was injured by a bullet wound inflicted by police during the capture, was in the ICU, was receiving significant pain medication, was confined on his back in a hospital bed, and was encumbered by tubes and needles.  *Id.* at 396.[5]

In *Townsend,* 372 U.S.  at 307, the Supreme Court found that the confession of a suspect under the effect of certain police-administered drugs used to treat his withdrawal symptoms was coerced and not "'the product of a rational intellect and a free will . . . .'"  *Id.* (quoting *Blackburn,* 361 U.S. at 208).  The *Townsend* Court noted that the standard applied "whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement." 372 U.S. at 307.  Applying that standard, the Court held as follows:

---

[5]The *Mincey* decision is consistent with an earlier Supreme Court finding of involuntariness.  In *Beecher v. Alabama,* 389 U.S. 35 (1967), the Supreme Court considered the voluntariness of two confessions.  The first was obtained after an African-American suspect had been shot in the leg by police officers, when two officers held weapons to the suspect's head and threatened to kill him if he did not admit to raping and killing a white woman.  The second confession was obtained at the hospital under the following circumstances:

> By June 22, the petitioner's right leg, which was later amputated, had become so swollen and his wound so painful that he required an injection of morphine every four hours.  Less than an hour after one of these injections, two Alabama investigators visited him in the prison hospital.  The medical assistant in charge told the petitioner to 'cooperate' and, in the petitioner's presence, he asked the investigators to inform him if the petitioner did not 'tell them what they wanted to know.'  The medical assistant then left the petitioner alone with the State's investigators.  In the course of a 90-minute 'conversation,' the investigators prepared two detailed statements similar to the confession the petitioner had given five days earlier at gunpoint in Tennessee.  Still in a 'kind of slumber' from his last morphine injection, feverish, and in intense pain, the petitioner signed the written confessions thus prepared for him.

*Id.* at 36-37.  The Court found both the confession at gunpoint and the hospital confessions to be involuntary.  The Court held that there was no realistic "break in the stream of events" between the time he was threatened and the second statement, "[f]or he was then still in pain, under the influence of drugs, and at the complete mercy of the prison hospital authorities."  *Id.* at 38.  While the *Beecher* Court undoubtedly was influenced by the earlier threats, in rejecting the voluntariness of the second confessions, the Court focused on the coercion inherent in a police interrogation while a suspect is hospitalized in significant pain and under the influence of narcotic medication.

> It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, that when brought about by a drug having the effect of a "truth serum."  It is not significant that the drug may have been administered and the questions asked by persons unfamiliar with hyoscine's properties as a "truth serum," if these properties exist.  Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible.

*Townsend*, 372 U.S. at 307-08.

Each of these decisions is implicated by the complex impairments presented in Petitioner's case and the detectives' knowledge of those impairments.  Although Petitioner was not subjected to as lengthy a session of questioning, as occurred in each *Blackburn*, *Mincey*, and *Townsend*, he was questioned two separate times and his circumstances otherwise contained substantial similarities with all of the combined circumstances in the cited cases.  Further, police were aware of those collective physical and mental impairments.

The state courts, however, never cited any of the applicable Supreme Court cases and failed to discuss any of the existing physical and mental circumstances within the context of its determination on voluntariness.  The courts did not consider the police knowledge and conduct in relation to *Connelly*, *Blackburn*, *Mincey* or *Townsend*.  Instead, the courts merely concluded that, absent "police misconduct," a confession necessarily must be found to be voluntary, regardless of the condition of the suspect and the police knowledge of that condition.  (MCOA Op. at 9.)  Indeed, the court of appeals concluded that the withholding of pain medication by police officers would not render a confession involuntary unless the suspect was aware the medication was being withheld and police implied the medication would be his reward for answering questions.  *Id.*

The reasoning of the Michigan Court of Appeals constitutes an unreasonable application of clearly established Supreme Court precedent.  Although the *Connelly* Court held that

"some sort of 'state action' [is required] to support a claim of violation of the Due Process Clause of the Fourteenth Amendment," the Court expressly reaffirmed the holdings in its prior decisions including *Blackburn*, *Mincey* and *Townsend*. *Connelly*, 479 U.S. at 165. The *Connelly* Court summarized *Blackburn* as a case in which state action had occurred because the police had become aware of the petitioner's history of mental problems during their interrogation, but nevertheless exploited that weakness by engaging in a lengthy interrogation in a tiny room in the absence of any family, friends or legal counsel. *Id.* at 165. The *Connelly* Court did not suggest that a lengthy interrogation held in a small room outside the presence of family or counsel in itself would constitute free-standing misconduct. Instead, the relevant state action was the form of interrogation in the context of police knowledge of a significant question of the suspect's sanity. Similarly, the *Connelly* Court summarized *Townsend* as holding that the police had engaged in wrongdoing by interrogating him after they knew he had been give a drug that, in fact, had truth-serum properties, even though they were unaware of those properties at the time. *Id.* The operative state action, as summarized in *Connelly*, was police awareness that the suspect was under the influence of a drug they had given him, regardless of their awareness of all of its operative properties.

Here, Petitioner's physical incapacity was arguably worse than that in *Mincey*, but contained most of the same elements: (1) he had been shot by police three times, once in the right leg, once in the upper left torso and once in the lower abdomen; (2) he had been out of surgery only seven or eight hours; (3) he was on significant pain medication; (4) he told the detectives he was in pain; (5) he told the officers he had not eaten or drunk for three days while in the woods, and he in fact had not eaten in four-and-one-half days; (6) he remained in the intensive care unit; (7) he had tubes in both his nose and mouth; (8) he could barely be heard over his own breathing; and (9) he

was suicidal.  In addition, Petitioner's mental state paralleled that present in *Blackburn*: (1) he was obviously mentally ill, and detectives were sufficiently concerned to see if he knew who and where he was;  (2) although his answers were responsive to questions, they were clearly delusional; and (3) the only expert to testify at the suppression hearing was the state's own court-appointed forensic psychiatric expert who concluded, based on the evidence of his own examination and the reports of all other treating doctors, that Petitioner was not sane or competent to waive his rights at the time of the confession.  The detectives were fully aware of Petitioner's physical condition and his drugged state, and they were aware that he was delusional.  Yet officers continued to question him because he was responsive and his speech was intelligible.

    Under the circumstances, the police questioning was consistent with that existing in both *Mincey* and *Blackburn* and fully distinguishable from *Connelly*.  As the Supreme Court noted in *Blackburn*, the state court's reliance on the simple fact that Petitioner did not appear agitated and spoke responsively is insufficient to demonstrate competence in the face of such substantial evidence of insanity.  "[W]ithout any evidence in the record indicating that these observed facts bore any relation to Blackburn's disease or were symptoms of a remission in his illness, we are quite unable to conclude that such an inference can be drawn."  *Id.* at 209.  That conclusion is even more applicable in this case, when coupled with Petitioner's three serious bullet wounds, treatment in intensive care, intubation, pain, drug ingestion, depression, and lack of food and water for more than four days.  Added to this was Dr. Mogy's unrebutted testimony concerning Petitioner's serious mental illness and the doctor's conclusion of incompetency, which the state courts chose to ignore or discount to virtual irrelevance.

I also reject as unreasonable the conclusion of the state court of appeals concerning the withholding of medication. The withholding of medication from a suspect to facilitate questioning must be considered coercive, regardless of whether the officers informed the suspect of their conduct and implicitly threatened or promised relief if he cooperated. Any conduct by police that would increase a suspect's pain during the course of questioning must be considered inherently coercive. *Cf. Moran*, 475 U.S. at 423 (noting that the level of police culpability is irrelevant to the voluntariness inquiry).

In sum, the state court failed entirely to weigh relevant factors in considering whether Petitioner's waiver was voluntary. Instead, the court improperly concluded that police coercive tactics were limited to affirmative, independent misconduct, rather than taking advantage of known physical and mental conditions in a manner that was coercive. The court also unreasonably concluded that withholding medication was not a coercive tactic unless police simultaneously threatened Petitioner with the withholding and promised relief in exchange for a confession. In light of the police officers' awareness of Petitioner's mental and physical condition, his lack of food and water over a period of days,[6] and his ongoing pain and weakness, the state court's conclusion that Petitioner voluntarily waived his *Miranda* rights did not constitute a reasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

As previously noted, the Michigan courts also concluded that Petitioner's waiver was both knowingly and intelligently made. The Supreme Court has noted that for a waiver to be

---

[6]The Supreme Court also has found relevant the deprivation of food in various cases. For example, in *Greenwald v. Wisconsin*, 390 U.S. 519 (1968), the Court held a petitioner's statement involuntary under circumstances in which the defendant, who was on medication, was interrogated for over 18 hours without food or sleep. In *Reck v. Pate*, 367 U.S. 433 (1961), the Court found a confession involuntary when it was obtained after the defendant had been held for four days with inadequate food and medical attention.

effective, it "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. Nevertheless, the Court has found that "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Moran*, 475 U.S. at 422. In *Spring*, 479 U.S. 564, the Supreme Court considered whether a criminal defendant waived his *Miranda* rights knowingly and intelligently. The *Spring* Court held that a suspect's awareness of the full range of crimes being investigated was irrelevant to whether the waiver was either voluntary or knowing. *Id.* at 577. In determining whether the waiver was knowingly and intelligently waived, as when considering whether the waiver was voluntary, a court should consider the "totality of the circumstances" of the interrogation to determine whether the suspect had the requisite level of comprehension. *Id.* at 574.

The court of appeals' decision that Petitioner knowingly and intelligently waived his *Miranda* rights was based in part upon findings of fact that were clearly contrary to the record. First, the court first concluded that the fact Petitioner had been without food or water for three days was caused by his own running away and hiding in the woods. The court therefore rejected the circumstance as legally irrelevant. That conclusion, however, is unsupported by law. In an evaluation of the totality of the circumstances of whether a suspect's physical or mental condition impairs his understanding and appreciation of his rights, the Supreme Court has never suggested that the condition must have been induced by the police to be relevant. Petitioner's lack of food and water for such an extended period of time, and the police officers' knowledge of that lack of food and water, clearly are relevant to an assessment of the totality of the circumstances of Petitioner's condition.

Second, in contravention of the uncontested factual record, the court rejected Petitioner's claim that, at the time he made his statement, he had neither eaten nor drunk for four-and-one-half days.  Instead, the court reached the wholly unsupported conclusion that Petitioner was receiving nutrition through the nasal gastric tube inserted into his stomach.  This conclusion is at odds with the record evidence.  According to the testimony of Nurse Jill Halsey, Petitioner had been given nothing to eat because he was still post-operative.  (3/30/99 HT, 26, 28.)  She testified that the nasal gastric tube was inserted to keep the stomach gases down and to prevent the patient from throwing up.  (3/30/99 HT 23.)  The state court's finding of fact on this point therefore is unsupported by and contrary to the record.  As a consequence, the state court's adjudication of the claim resulted in a determination that was based, at least in part, on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  *See* 28 U.S.C. § 2254(d)(2).

In addition to the state court's unsupported factual conclusions, Petitioner's statement itself conflicts with the record evidence, further suggesting that he was not capable of intelligently waiving his rights.  In response to questioning about why he shot at officers on the day he was captured, Petitioner accepted the police statement that he had, in fact, shot at officers before his arrest.  The record facts indicate, however, that Petitioner never aimed or fired his weapon at officers.

In sum, in light of the police officers' awareness of and manipulation of Petitioner's extremely serious physical condition and documented mental illness, his lack of food and water over a period of days, his ongoing pain and weakness, and the influence of narcotic medications, I

conclude that the state court's application of clearly established Supreme Court precedent was not reasonable.  28 U.S.C. § 2254(d)(1).

Having found error, I must consider whether the admission of the statements was harmless.  An error is considered harmless unless the habeas court finds that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict."  *See Nevers v. Killinger*, 169 F.3d 352, 371 (6th Cir. 1999) (holding that *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), standard continues to apply on habeas review even after the amendments to the AEDPA), *abrogated in other part by  Williams v. Taylor*, 529 U.S. 362, 412-413 (2000); *see also Penry v. Johnson*, 532 U.S. 782, 784 (2001) (applying *Brecht* standard in § 2254).  The habeas petitioner must establish that the error resulted in actual prejudice.  *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000).  The harmless error standard announced in *Brecht* applies even if a federal habeas court is the first to review for harmless error.  *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999).

The admission of Petitioner's statements clearly was not harmless error.   Because Petitioner was convicted of being guilty but mentally ill, the critical question in the case was not whether he was mentally ill, but whether he was legally insane.  As the trial court instructed the jury:

> To be legally insane, the person must, because of his mental illness lack substantial capacity either to appreciate the nature and quality of the wrongfulness of his conduct or conform his conduct to the requirements of the law.

(Tr. IV, at 449.)  *See also* MICH. COMP. LAWS 768.21(1) (defining insanity).   An essential component of the inquiry, therefore, was whether Petitioner was capable of appreciating the wrongfulness of his conduct.   In closing arguments, the prosecutor emphasized that Petitioner's statement demonstrated that he knew that shooting Tony Gillespie was against the law.  The

- 42 -

prosecutor therefore argued that Petitioner understood that killing Gillespie "was not the thing to do."  (Tr. III, 413.)

The impact of Petitioner's statement concerning his understanding was extremely important to the prosecution's case on the insanity defense.  The prosecution's proofs on this issue were extremely thin.  Other than arguing inferences from the orderliness of Petitioner's conduct on the morning of the shooting, the prosecutor introduced no evidence on the question of Petitioner's sanity besides the testimony of the victim's three sons, who testified that they had met Petitioner on several occasions and had not suspected that he was insane or delusional.[7]  Under Michigan law at the time of the trial, insanity was an affirmative defense and a defendant had the burden of proving insanity by a preponderance of the evidence.[8]  However, once a defendant has introduced evidence of insanity,  the prosecution bore the burden of proving the defendant's sanity beyond a reasonable doubt.  MICH. COMP. LAWS § 768.36(1)(c) (1975 version).  In *People v. Murphy*, 331 N.W.2d 152, 157-58 (Mich. 1982), the Michigan Supreme Court discussed the quantum of proof necessary to

---

[7]The prosecutor also suggested that, because his truck was driven into the trees at the end of a two-track road, the jury should infer that he attempted to hide it, thereby suggesting he had guilty knowledge.

[8]MICH. COMP. LAWS § 768.21a statutorily defines the defense:

(1)  It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense.  An individual is legally insane if, as a result of mental illness as defined in [MICH. COMP. LAWS § 330.1400a], or as a result of being mentally retarded as defined in [MICH. COMP. LAWS § 330.1500], that the person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law.  Mental illness or being mentally retarded does not otherwise constitute a defense of legal insanity.

(2)  An individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances.

(3)  The defendant has the burden of proving the defense of insanity by a preponderance of the evidence.

constitute sufficient evidence of sanity under the statute. The *Murphy* court recognized that competent lay witness testimony may serve as support for the find of sanity and may be used to rebut expert testimony to the contrary. *Id.* at 158. The court, however, rejected as insufficient the testimony of several police officers who had the opportunity to observe the defendant's behavior for 30 minutes, who stated that they did not observe an abnormal act. *Id.* The court held as follows:

> In order to send this case to the jury, the prosecution needed to present something more than minimal evidence of sanity. A lay witness's observation of abnormal acts by the defendant has greater value as evidence than testimony that the witness never observed an abnormal act unless the witness had prolonged and intimate contact with the accused. The testimony of these police officers that the defendant seemed all right has only slight probative value. Moreover, it is not clear that the witnesses' testimony actually negated any part of the insanity test, which requires the prosecutor to prove that the defendant could appreciate the wrongfulness of his conduct and had the capacity to conform his conduct to the requirements of the law. Something more is needed than was presented here in order to pass appellate muster.

*Id.* (citations omitted). Under the reasoning and holding in *Murphy*, the testimony of Gillespie's sons concerning their casual acquaintance with Petitioner and their failure to observe abnormal behavior was clearly inadequate to support a finding of sanity beyond a reasonable doubt.

In the face of such minimal and, under state law, insufficient evidence that Petitioner was sane, Petitioner's inadmissible statement about his capacity to appreciate the wrongfulness of his conduct was essentially the only evidence of supporting the jury's finding of sanity. It is highly probable, therefore, that the admission of the statement "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. Indeed, without this evidence, petitioner was likely entitled to a directed verdict of acquittal under *Murphy* on the basis of his insanity defense.

In sum, because admission of the statements was neither constitutionally proper nor harmless, I recommend that the petition be granted on the first habeas ground.

II.      Lack of Competent Evidence of Sanity

Petitioner next contends that the prosecution failed to introduce sufficient evidence to rebut Petitioner's proof that he was legally insane. Petitioner's second ground for habeas relief is one of state law only, not cognizable in this habeas proceeding.

The Court may entertain an application for habeas relief on behalf of a person in custody pursuant to the judgment of a State court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). The federal courts have no power to intervene on the basis of a perceived error of state law. *Pulley v. Harris*, 465 U.S. 37, 41 (1984). It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). As a consequence, the court on habeas review is limited to reviewing questions of federal constitutional law. *Id.*

A section 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988). The *Jackson* decision instructs that constitutional review for the sufficiency of evidence must be made "with explicit reference to the

substantive elements of the criminal offense as defined by state law." 443 U.S. at 324 n.16. *See also In re Winship*, 397 U.S. 358, 364 (1970) (due process is satisfied if the prosecution proves every element of a charged offense beyond a reasonable doubt). The Sixth Circuit has held that challenges to evidence on non-elements do not generally implicate the due process concerns addressed by *Jackson* and *Winship*. *See Gall v. Parker*, 231 F.3d 265, 286-87, 307-08 (6th Cir. 2000) (addressing Kentucky law of insanity), *overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003); *Caldwell v. Russell*, 181 F.3d 731, 740 (6th Cir. 1999) (holding that *Jackson* "does not implicate affirmative defenses, because proof of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime"); *Allen*, 858 F.2d at 1200.

Under Michigan law, sanity is not an element of substantive criminal charges, but is instead an affirmative defense. *See* MICH. COMP. LAWS § 768.21a. In *Duffy v. Foltz*, 804 F.2d 50 (6th Cir. 1986), relying on the Michigan Supreme Court's answer to a certified question in *In re Duffy*, 390 N.W.2d 620, 621 (Mich. 1986), the Sixth Circuit held that sanity is not an element of the substantive offenses of rape and kidnaping under Michigan law. *See* 804 F.2d at 54. Subsequently, in *Allen*, 858 F.2d at 1197, the Sixth Circuit reaffirmed the principle that insanity is an affirmative defense to Michigan criminal charges and found that proof of sanity is not an element of the offenses of assault with intent to rob and assault with intent to murder. Since *Allen* and *Duffy*, the courts continue to conclude that the structure of Michigan law makes insanity an affirmative defense. *See, e.g., Johnigan v. Elo*, 207 F. Supp. 2d 599, 611 (E.D. Mich. 2002). As a result, a claim that the prosecution failed to meet its burden to prove sanity is not cognizable in a habeas proceeding because it fails to raise a federal constitutional issue. *Duffy*, 804 F.2d at 54; *Gall*, 231 F.3d at 304.

- 46 -

Without acknowledging these authoritative cases, Petitioner argues that proof that the defendant is guilty but mentally ill imposes the constitutional obligation on the prosecution to prove that Petitioner was not legally insane beyond a reasonable doubt. *See* MICH. COMP. LAWS § 768.36(1) (subsequently amended eff. May 1, 2002).[9] In support of his claim, Petitioner cites *People v. Stephan*, 616 N.W.2d 188, 196 (Mich. Ct. App. 2000), for the proposition that, because the prosecutor unquestionably had the burden of proving sanity beyond a reasonable doubt, insufficient evidence of sanity necessarily raises a constitutional question.

Nothing about the *Stephan* decision suggests that Michigan altered its substantive law since *In re Duffy*, 390 N.W.2d at 621, which held that sanity is not an element of Michigan substantive criminal offenses. In *Stephan*, the court merely addressed a prosecutor's challenge to the burden of proof under the guilty-but-mentally-ill statute as being in conflict with the burden of proof imposed under the insanity statute after that statute's amendment in 1994. Prior to 1994, the prosecutor bore the ultimate burden of rebutting beyond a reasonable doubt the defendant's evidence of insanity under both the insanity statute and the guilty-but-mentally-ill statute. *See* MICH. COMP. LAWS §§ 768.21a, 768.36. After the 1994 amendment to the insanity statute, under § 768.21a, the defendant bore the burden of persuasion by a preponderance of the evidence for the insanity defense, while under § 768.36, the prosecutor continued to bear the burden of persuasion beyond a reasonable doubt. The *Stephan* court concluded that, notwithstanding the conflict between the burdens of persuasion created by the 1994 legislative amendment to MICH. COMP. LAWS § 768.21a, the court

---

[9]The Michigan courts have interpreted MICH. COMP. LAWS §§ 768.21a and 768.36, together with MICH. COMP. LAWS § 768.29a (governing the form of instructions when a defense of insanity has been raised), "to manifest an intention to bring under one procedural blanket all defenses to criminal charges that rest upon legal insanity as defined in the statute." *People v. Mangiapane*, 271 N.W.2d 240, 248 (Mich. Ct. App. 1978); *see also People v. Stephan*, 616 N.W.2d 188, 197 (2000) ("Without doubt, the Legislature intended the insanity defense and [guilty-but-mentally-ill] verdict statutes to function jointly in furtherance of a common purpose.").

would not harmonize the legislation by inferring that the legislature had implicitly amended the requirement under the guilty-but-mentally-ill statute that the prosecution prove sanity only by a preponderance of the evidence. *Id.* at 201-02.

Regardless of the *Stephan* decision on the burden of proof, no change was created by the modification of the statute that would impact the prior holdings by the Michigan Supreme Court and the Sixth Circuit that insanity is an affirmative defense and does not constitute an element of an underlying criminal offense. *See In re Duffy*, 390 N.W.2d at 621*; Duffy*, 804 F.2d at 54; *Allen*, 858 F.2d at 1197. Those decisions were reached under prior Michigan law on the burden-shifting insanity defense, under which the prosecution bore the ultimate burden of persuasion beyond a reasonable doubt for both the insanity defense and the guilty-but-mentally-ill finding. *See In re Duffy*, 390 N.W.2d at 623-24. In other words, prior to 1994, notwithstanding the fact that the prosecution bore the ultimate burden of persuasion, both the Michigan Supreme Court and the Sixth Circuit held that proof of sanity is not an element of Michigan substantive criminal offenses. *Id*; *Allen*, 858 F.2d at 1157. As a consequence, *Stephan*'s reaffirmation of the prosecutor's burden of proof with respect to the guilty-but-mentally-ill finding does not alter the conclusion that the insanity defense is a burden-shifting affirmative defense that does not involve the elements of the substantive offense. Accordingly, Petitioner's second ground for relief is not cognizable in a habeas proceeding.

III.    Prosecutorial Misconduct

In his third ground for habeas relief, Petitioner asserts that he was denied due process and a fair trial by three instances of prosecutorial misconduct. First, he asserts, the prosecutor impermissibly denigrated the defense of insanity and attempted to frighten the jury about the consequences of a decision to find Petitioner not guilty by reason of insanity. Second, Petitioner

- 48 -

argues that the prosecutor impermissibly invited Detective Sexton to testify that Petitioner had stopped talking on the advice of counsel after his attorney arrived.  Third, Petitioner contends that the prosecutor impermissibly appealed to juror sympathy in his closing argument.  Petitioner asserts that, considered separately or cumulatively, the instances of prosecutorial misconduct violated his right to due process.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003), *cert. denied*, 541 U.S. 1095 (2004).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  Based on Supreme Court precedent, the Sixth Circuit has adopted a two-step approach for determining whether prosecutorial misconduct violates a defendant's due process rights.  *See United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001); *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (utilizing this test to evaluate a due process claim based upon prosecutorial misconduct raised in a post-AEDPA habeas petition).  The Court first must consider whether the prosecutor's conduct and remarks were improper.  *Carter*, 236 F.3d at 783.  If the Court finds that the remarks were improper, it must apply the four-factor test set forth in *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994), to determine whether the impropriety violated the defendant's due process rights or was harmless.  *Carter*, 236 F.3d at 783.  The four factors are as follows: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or

extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *Carroll*, 26 F.3d at 1385. The first factor of the test includes consideration whether the trial judge gave a cautionary instruction. *Id.* "In assessing whether the error amounts to a constitutional deprivation, the court must view the totality of the circumstances." *See Gall*, 231 F.3d at 311.

The Michigan Court of Appeals applied a substantially similar standard of review of Petitioner's various prosecutorial misconduct claims:

> Hanna asserts a number of instances of alleged prosecutorial misconduct. We review a trial court's evidentiary decisions for an abuse of discretion. With respect to issues of prosecutorial misconduct, this Court evaluates the prosecutor's comments in context to determine if the defendant was denied a fair trial.

(MCOA Op. at 13.) *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (a state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them").

Because some of the instances of prosecutorial misconduct were the subject of contemporaneous objection while others were not, I will assess each claim separately. However, under the four-factor test applied in the Sixth Circuit, the flagrancy of the prosecutorial misconduct requires a determination of the extensiveness of all instances of misconduct. *Carroll*, 26 F.3d at 1385, 1386 & n.7 (noting that single incidence of misconduct may be sufficiently severe to deny a fair trial, but that cases frequently involve a series of incidents). Accordingly, I also will assess the cumulative impact of all three instances of prosecutorial misconduct.

### A.        Denigration of insanity defense

During rebuttal, the prosecutor made the following arguments:

- 50 -

> *We do not want to create a ready avenue of escape for a person who does a dastardly deed and kills another human being via the reason of insanity* because you enjoy some beliefs you think you have so therefore that puts me home free for whatever I do.
>
> The word we are really speaking about is responsibility.  We all have to be responsible at one time or another for the course we choose to follow.  Mr. Hanna elected to read the Bible, perhaps focus on the very controversial parts, as has been indicated, talking about Revelations, which was his understanding, not your understanding perhaps.  This is what makes it a controversial area.  It is a controversial book in itself.  This whole area is somewhat controversial.  *I don't think we can allow fixations of the mind to allow anyone to destroy another person and to be excused by reason of saying they're insane.*

(Tr. IV, 425-26) (emphasis added).  Petitioner contends that the prosecutor's comments denigrated the insanity defense itself and informed the jury that a verdict of not guilty by reason of insanity would allow Petitioner to get away with murder, escaping all judgment.  Plaintiff also alleges that the argument was improper because it tended to divert the jury from the issue it was required to decide: that is, whether Petitioner was legally insane.

The Michigan Court of Appeals held that Petitioner had failed to object to the prosecutor's remarks.  The court therefore found that the Petitioner had waived the claim on appeal, except to the extent the comments resulted in manifest injustice.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground

- 51 -

properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 551-52; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.[10] It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See*

---

[10]I note that, after closing arguments and before the jury was sent to deliberate, defense counsel raised two objections to the prosecutor's closing argument and sought curative instructions. First, defense counsel objected to the prosecutor's emotional appeal concerning Father's Day. Second, counsel objected as follows: "I believe it was the prosecutor's statement, the jury had a duty to convict and send a message. That is not the law, the courts have found this sort of appeal to be invalid. I believe that is an improper argument." (Tr. IV, 456.) Because the only argument to which defense counsel could have been referring was the prosecutor's remark in issue here, it appears that defense counsel may have attempted to make an objection. Nevertheless, the objection was far from clear and the Michigan Court of Appeals squarely held that Petitioner failed to comply with the state procedural rule requiring him to make a timely objection to the statement.

*Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Further, even when the state court reviews the issue under a manifest injustice standard or to prevent a miscarriage of justice, Petitioner's failure to object is still considered a procedural default. *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

As cause excusing his procedural default, Petitioner asserts that trial counsel was ineffective in her failure to object to the prosecutor's denigration of the defense. To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). Petitioner raised his claim of ineffective assistance of counsel in his direct appeal to the Michigan Court of Appeals and in his application for leave to appeal to the Michigan Supreme Court. As a result, the claim is exhausted.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The

- 53 -

defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

In order to assess whether Petitioner has demonstrated cause excusing his procedural default, the Court must first consider the merits of the particular prosecutorial misconduct claim in order to determine whether counsel was ineffective in failing to object. *See Hicks*, 377 F.3d at 554 (examining merits of claim in determining effectiveness of both trial and appellate counsel); *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004) (analyzing ineffective assistance of appellate counsel by reviewing merits of claim and the impact on appeal of properly raised claim). The Court also must assess whether any state court determinations of the issue were objectively reasonable. *See* 28 U.S.C. § 2254(d).

Notwithstanding Petitioner's failure to object, the Michigan Court of Appeals reviewed the merits of his claim to determine whether manifest injustice had not accrued as a result of the prosecutor's argument:

Where the issue at trial is the insanity defense, the question before the jury is that of the defendant's sanity or insanity at the time of the crime, not the possibility or even probability that an accused will in the future commit some other criminal act. Thus, inflammatory argument suggesting that a wrongdoer may go free and "to go out and shoot somebody else", warrants reversal even if there was no objection. However, although the remarks about which Hanna complains did suggest that Hanna hoped to escape responsibility for his conduct through the insanity defense, the prosecutor did not suggest that the jury should eschew that verdict in order that Hanna not be allowed to kill again. This is distinguishable from *People v Lewis*[, 37 Mich App 548, 553; 195 NW2d 30 (1972)], in that *Lewis* involved extensive argument concerning the penal ramifications of the various verdicts. Here the prosecutor, at worst, only glanced off such an argument. Although a curative instruction could not have remedied the prejudice in *Lewis*, one in this case would have cured any prejudice stemming from the prosecutor's remarks.

Further, the trial court did provide the customary instruction, "Possible penalty should not influence your decision," and we presume that juries follow their instructions. Such a result squares with respect for juries. Additionally a trial court may cure improper civic-duty arguments when it instructs the jury that arguments of counsel are not evidence. Here, the trial court specifically so instructed the jury.

(MCOA Op. at 14-15 (citation footnotes omitted).) The court of appeals' analysis is both factually and legally unreasonable.

The Sixth Circuit previously has considered whether a prosecutor's denigration of the legally viable defense of insanity constituted prosecutorial misconduct. *See Gall*, 231 F.3d at 311-12. Applying Supreme Court precedent in *Donnelly* and *Darden*, the Sixth Circuit found that prosecutor's remarks violated due process and warranted habeas relief, even in the absence of an objection.[11] *Id.* During closing argument, the prosecutor in *Gall* significantly misrepresented the psychological evidence and disparaged the possibility that psychological evidence may ever be worthy of belief. *Id.* at 312-13. The court found that the prosecutor's remarks "comprised part of

---

[11]I note that, although the remarks in *Gall* were not the subject of proper objection, the claim was not procedurally defaulted because the Kentucky Supreme Court addressed and rejected the claim on its merits. *Gall*, 231 F.3d at 310.

a broader strategy of improperly attacking Gall's insanity defense by criticizing the very use of the defense itself, rather than addressing its evidentiary merits head on." *Id.* at 313.  The court noted that "[c]ourts have long castigated prosecutors when their efforts to rebut an insanity defense constitute no more than an attack on the rationale and purpose of the insanity defense itself." *Id.* (citing *Garron v. State*, 528 So.2d 353, 357 (Fla. 1988); *People v. Wallace*, 408 N.W.2d 87, 91 (Mich. Ct. App. 1987); *State v. Percy*, 507 A.2d 955, 958 (Vt. 1986)).

In reaching its conclusion, the *Gall* court recognized that, in a case raising the insanity defense, a prosecutor is entitled to vigorously press the case for a finding of sanity.  However,

> because ours is a system of law, the arsenal available to a prosecutor to achieve that legitimate goal is limited to arguments rooted in properly introduced evidence and testimony rather than words and tactics designed to inflame passions, air unsubstantiated prosecutorial beliefs, and downplay the legitimacy of a legally recognized defense.

*Id.* at 316.  In light of the extensiveness of the prosecutor's comments and his suggestion that the defendant would go free if found not guilty, the court granted habeas corpus relief on this ground. *Id.*

The prosecutor's remarks in the instant case clearly attacked a legally recognized defense presented by Petitioner in a manner the Sixth Circuit condemned in *Gall*.  While the Michigan Court of Appeals considered the argument on appeal to determine whether the comment had resulted in manifest injustice, it failed accurately to characterize the content of the prosecutor's comment and the nature of Petitioner's claim.  The court instead recharacterized Petitioner's claim as a claim that the prosecutor had improperly suggested that Petitioner would go out and harm someone else if not convicted.  (MCOA Op. at 14 (citing *Lewis*, 195 N.W.2d 30, and *People v.*

- 56 -

*Graves*, 581 N.W.2d 229 (Mich. 1998)).)[12] The court then found that the comment in the instant case only tangentially made the suggestion that Petitioner would go out and harm someone else, and therefore the comment did not implicate fundamental fairness. In other words, the court set up a straw-man argument not raised by Petitioner and then determined Petitioner had failed to make out that claim. The court, however, did not discuss the claim actually made by Petitioner; that is, that the prosecutor's argument unconstitutionally disparaged the legally viable insanity defense. *See Wallace*, 408 N.W.2d at 91 (holding that prosecutor's remarks denigrating the insanity defense were improper).

  As a result, the appellate court's rationale rested on an inaccurate characterization of Petitioner's argument, and the court failed to address the claim raised by Petitioner. The court therefore reached no determination regarding the impropriety of the comments as an attack on a legal defense. This resulted in an unreasonable application of Supreme Court authority. 28 U.S.C. § 2254(d)(1).

  Considering the four factors for determining whether prosecutorial misconduct violates due process, the prosecutor's remarks disparaging the defense, taken in the full context of the case, must be considered to rise to the level of prosecutorial misconduct. *See Carter*, 236 F.3d at 783 (describing four factors); *Gall*, 231 F.3d at 311-12 (applying four-factor test). First, the remarks were likely to mislead the jury and were of the same kind as those described in *Gall*.[13] The

---

[12]While Petitioner cited *Lewis*, 195 N.W.2d at 30, in his appellate brief, he did not rely upon the case to support an argument that the prosecution had suggested Petitioner would harm someone else if not convicted. Instead, *Lewis* was cited in conjunction with *Wallace*, 408 N.W.2d at 90, to argue that due process prohibited a prosecutor from effectively seeking jury nullification by denigrating the defense.

[13]In applying a Sixth Circuit case to analyze the flagrancy of prosecutorial misconduct during closing argument, I am cognizant of this Court's obligation under the AEDPA to apply only established United States Supreme Court precedent to cases before the court on habeas review. *See* 28 U.S.C. § 2254(d). *Gall*, however, constitutes a decision

sole issue in the instant case was Petitioner's sanity at the time of the killing.  In the context of the instant case, in which the prosecution presented essentially no evidence to contradict the testimony of the four psychologists and psychiatrists who had examined Petitioner and found him to be insane, an attack on the defense itself was very likely to mislead the jury.  *See Gall*, 231 F.3d at 315 & n.24 (absence of factual evidence of sanity renders improper attack more significant); *see also Darden*, 477 U.S. at 182 (strength of evidence is substantial factor in weighing the effect of prosecutor's improper remarks during closing argument).  Further, the remarks were made during rebuttal argument, at a time the defendant had no further opportunity to argue.

Second, the remarks did not consist of an isolated comment.  Instead, the prosecutor's statements involved two full paragraphs of argument during a relatively brief rebuttal.  The prosecutor directly and flagrantly asked the jury to reject the law and not allow Petitioner to escape punishment because he is insane.  *Id.* at 314-15.  While the comments were not as pervasive as those present in *Gall*, they were more pointed, directly arguing what the comments in *Gall* merely implied.  *Id.*  Further, as will be discussed *infra*, the remarks were made as part of a larger set of improper prosecutorial conduct and remarks during closing.

Third, the remarks unquestionably were intentional.  The prosecutor clearly and unequivocally told the jury that it should not allow "a ready avenue of escape for a person who does a dastardly deed and kills another human being via the reason of insanity because you enjoy some

---

by the Sixth Circuit that applied United States Supreme Court authority in a review controlled by the AEDPA to a situation involving prosecutorial misconduct during closing arguments.  *See Gall*, 231 F.3d at 311-12 (citing *Darden*, 477 U.S. at 179.)  Where, as here, the Sixth Circuit has granted habeas relief by applying Supreme Court precedent to a comparable factual situation, this Court must consider the Sixth Circuit case to be at least instructive precedent concerning the existence and application of clearly established Supreme Court authority.

beliefs you think you have so therefore that puts me home free for whatever I do." The argument reflects the prosecutor's choice to disparage the very existence of the defense.

Finally, the evidence of Petitioner's sanity was virtually nonexistent, while the evidence of his insanity was substantial. *See Carter*, 236 F.3d 777, 783. In the context of the whole case, the remarks were of increased importance. *See Gall*, 231 F.3d at 311 (in assessing whether error amounts to a constitutional deprivation, the court must view the totality of the circumstances.); *see also Darden*, 477 U.S. at 182 (examining impact of prosecutor's closing argument in context of whole case to determine whether misconduct deprived Petitioner of a fair trial). As in *Gall*, because the prosecution failed to present an expert who had examined the defendant and assessed his sanity, the prosecution was limited to attacks on "[Petitioner]'s insanity defense compris[ing] largely 'foul blows' having little to do with cognizable facts or evidence." 231 F.3d at 311.

Having determined that the prosecutor's remarks were constitutionally significant, I must consider whether counsel's failure to object rises to the level of ineffective assistance of counsel. While the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, the argument in issue was clear error to which reasonable counsel would have objected. No reasonable trial strategy would support the action. To the extent counsel may have preferred not to draw attention to the comments during the argument itself, no basis exists for failing to raise the objection after the argument – a strategy that the Michigan Court of Appeals held to be a proper objection for another instance of asserted prosecutorial misconduct. (MCOA Op. at 15.) Moreover, by defense counsel's own admission during testimony on a motion for new trial, the failure to object was not based on strategy, but upon error caused by her frustration with the whole of the argument. (4/17/00 Tr., 16; docket

- 59 -

#32.)  I therefore conclude that the failure to object was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

In addition, I conclude that counsel's failure caused actual prejudice.  To establish prejudice, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  As I previously have observed, the admissible evidence of Petitioner's sanity was exceptionally thin and insufficient under Michigan law to support the finding of guilty but mentally ill.  *See Murphy*, 331 N.W.2d at 157-58.)  Had counsel properly objected and sought exclusion of the comment and a curative instruction, it is likely that the result would have been different.  In sum, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

Because Petitioner's procedural default is excused by the ineffectiveness of trial counsel and because the prosecutor's improper remarks regarding the insanity defense were sufficiently egregious as to deny petitioner a fundamentally fair trial, I recommend that habeas relief be granted on this claim of prosecutorial misconduct.

### B.    Appeal to jury sympathy

Petitioner also contends that the prosecutor engaged in misconduct by improperly appealing to the jurors' sympathy during closing arguments.  The following remarks are in issue:

> It's, as I say, just so sad it's hard to really deal with it.  Doubly sad at this time of year when the nation just finished celebrating a recognized holiday called Father's Day.  The Gillespies unfortunately did not have the luxury of an enjoyable Father's Day with husband and father.

(Tr. III, 426-27.)   After the jury was excused, defense counsel objected and requested a jury instruction.

As I previously discussed, in order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643).  The Michigan Court of Appeals applied the correct constitutional standard, evaluating whether the prosecutor's comments, in context, denied Petitioner a fair trial.  The court held that the mention of Father's Day was gratuitous and may well have been calculated to evoke sympathy.  However, in light of the brevity of the comments and a jury instruction directing the jury not to be moved by sympathy or prejudice, the remark by itself did not deny Petitioner a fair trial.

The prosecutor's comments were improper and undoubtedly were designed to invoke jury sympathy.  Standing alone, however, they were not so inflammatory as to constitute a denial of due process.  The cases in which the Sixth Circuit has found prejudicial misconduct have involved much more egregious and pervasive attempts to evoke sympathy.  For example, in *United States v. Payne*, 2 F.3d 706, 711-15 (6th Cir. 1993), the Court of Appeals  reversed a federal conviction because of the prosecutor's repeated references to Christmas time, poor pregnant women, and employee layoffs, finding that the prosecutor's statements were part of a "calculated effort to evoke strong sympathetic emotions" for victims and against the defendants.  Similarly, in *Martin v. Parker*, 11 F.3d 613 (6th Cir. 1993), the Court of Appeals condemned the prosecutor's repeated references to the defendant as a "Hitler," a "dictator," a "disturbed individual," and "one of the most obnoxious witnesses you'll ever hear."  *Martin*, 11 F.3d at 616; *accord United States v. Steinkoetter*, 633 F.2d

719, 720-21 (6th Cir. 1980) (prosecutor's comparison of defendant to Pontius Pilate and Judas Iscariot require reversal).  Hence, although the comments were inflammatory and improper, they did not, standing alone, constitute a due-process violation.

On the facts of the instant case, the state court's determination that the prosecutor's appeal to juror sympathy did not deny due process was not an unreasonable application of established Supreme Court authority.

### C.   Eliciting reference to Petitioner's silence

The third incident of  prosecutorial misconduct about which Petitioner complains involved the prosecutor's questioning of Detective Sexton, during which he elicited evidence concerning Petitioner's invocation of his right to remain silent.  At issue is the following colloquy:

> Q:   (By Mr. Elliott, continuing:)  Thank you.  The interview was terminated by the arrival of Miss Church; is that correct?
>
> A.   Not on her arrival.  When she arrived I asked if he still wanted to continue talking and he stated on the record with the advice of counsel he was not going to.
>
> Q.   He was aware of that, anyway?
>
> A.   Yes.

(Tr. III, 273.)  Petitioner argues that the prosecutor improperly introduced evidence that he had invoked his right to counsel as evidence that he was aware of what he was doing and was not insane.

The Michigan Court of Appeals determined that Petitioner had failed to object to the questioning at trial and accordingly review was limited to avoiding manifest injustice.  The court then found that the use of Petitioner's silence did not cause manifest injustice:

> It is well established that a defendant's silence may not be used as substantive evidence of guilt.  Here, however, the question of whether Hanna shot and killed the

-62-

victim was not at issue; there is no question that he did, in broad daylight in front of several witnesses.  Further, the evidence that the prosecutor elicited concerned *why* the second police interview stopped.  Detective Sexton's testimony specifically attributed the decision to terminate the interview to the appearance of defense counsel.  It is a strained reading of these events that suggests that the jury inferred Hanna's guilt from his subsequent silence.  Had there been an objection, any prejudice Hanna may have suffered in the event could readily have been remedied by a curative instruction.  Because Hanna's identity as the killer was not at issue and his cooperation with defense counsel in declining to speak further to the police bears only tangentially on the defense theory of insanity, we conclude that no manifest injustice resulted and that this incident warrants no appellate relief.

(MCOA Op. at 13.)

In *Doyle v. Ohio*, 426 U.S. 610 (1976), the Supreme Court held that a defendant's right to due process was violated by the prosecutor's use of his post-arrest silence.  The Court held that it is fundamentally unfair to assure a defendant that he or she has the right to remain silent and then subsequently use the exercise of that right to impeach the defendant's explanation offered at trial.  *Id.* at 618.  In *Wainwright v. Greenfield*, 474 U.S. 284, 292 (1986), the Supreme Court applied *Doyle* in case involving the use of a defendant's silence to undermine the defendant's insanity defense.  In *Wainwright*, the prosecution argued that the defendant's invocation of his right to remain silent "demonstrated a degree of comprehension that was inconsistent with his claim of insanity." *Id. at 287.*  The Supreme Court rejected the prosecution's argument, holding that the use of defendant's silence to undermine his affirmative defense of insanity violated due process:

The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony.  It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity.  In both situations, the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized.  In both situations, the State then seeks to make use of the defendant's exercise of those rights in obtaining his conviction.  The implicit promise, the breach, and the consequent penalty are identical in both situations.

-63-

*Id.* at 292.

Here, the Michigan Court of Appeals failed to apply the relevant Supreme Court case law.  Instead, the court held that, because there was no question that Hanna actually performed the shooting and identity was not in question, the use of Petitioner's silence was not related to a finding of guilt and, therefore, was not constitutionally problematic.  The court's conclusion is directly contrary to the Supreme Court's decision in *Wainwright.  See Williams*, 529 U.S. 362 (a decision is contrary to Supreme Court law when the state court "arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or decided a case differently than the Supreme Court on materially indistinguishable facts").  As is obvious from the prosecutor's questions, the very purpose for which the Petitioner's silence was admitted into evidence to demonstrate that Petitioner was aware of and comprehended his rights, suggesting that he was not insane.  *Wainwright*, which the state courts ignored, condemns this use of a defendant's silence.

Moreover, the suggestion that the invocation was proper because it provided an explanation for the termination of the interview is completely unsupported by the law.  No explanation was required for the jury.  To allow such an exception would undermine the rule in every case.  The prosecutor could always suggest that he needed to explain why he did not have a statement or more of a statement as a basis for introducing the defendant's exercise of his constitutional right to silence.  Accordingly, the state court's determination on this claim clearly is contrary to established Supreme Court precedent.

However, as I previously noted, the Michigan Court of Appeals reviewed the claim only for manifest injustice because Petitioner failed to lodge a contemporaneous objection to the prosecutor's introduction of Petitioner's decision to terminate his interview with police.  The

contemporaneous objection rule was well-established at the time of Petitioner's trial, *see, e.g.*, *Kelly*, 423 Mich. at 271, and the failure to comply with the rule constitutes a procedural default.  *See Wainwright*, 433 U.S. at 87-88; *Lancaster*, 324 F.3d at 437; *West*, 73 F.3d at 84.    The Court therefore must consider whether the ineffective assistance of trial counsel serves as cause excusing the procedural default.

   I conclude that counsel's failure to object rises to the level of ineffective assistance of counsel.  While the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, the rule prohibiting the introduction into evidence of a defendant's invocation of his right to remain silent is black-letter law.  I can conceive of no reasonable trial strategy that would support the introduction of Petitioner's silence into the case.  In addition, the use of Petitioner's silence was specifically directed to the only issue in question: Petitioner's insanity.  The Supreme Court squarely has rejected the use of a petitioner's silence to prove sanity, and no competent lawyer would have permitted its introduction here, especially where, as here, the prosecution introduced no expert evidence demonstrating that Petitioner was sane.  I therefore conclude that the failure to object was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  "[T]he prosecutor's misconduct was plain enough for a minimally competent counsel to have objected." *Washington v. Hofbauer*, 228 F.3d 689, 707 (6th Cir. 2000) (holding that an attorney's failure to object to plain prosecutorial misconduct cannot constitute legitimate trial strategy).

   In addition, I conclude that counsel's failure, especially when considered in conjunction with her other failures to object to prosecutorial misconduct, caused actual prejudice. The admissible evidence to support the finding of guilty but mentally ill was insufficient.  Had

counsel properly objected and sought exclusion of the evidence, there is a reasonable probability that the result would have been different. In sum, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### D.    Cumulative effect of prosecutor's misconduct

Petitioner raises multiple instances of prosecutorial action in building his claim of prosecutorial misconduct. I have discussed whether each individual instance of prosecutorial misconduct can be said to rise to a due process violation under the applicable standard. *Carroll*, 26 F.3d at 1385. However, in order to review the level of impropriety of prosecutorial misconduct, the Court must examine both the extensiveness and the impact of all of the alleged misconduct in the context of the case. *Id.* at 1387 (noting that most cases of unconstitutional prosecutorial misconduct involve multiple instances of misconduct).[14]

The three instances of prosecutorial error raised by Petitioner all involved prejudicial misconduct. Indeed, I have held that at two of those errors, standing alone, were sufficiently serious to meet the *Carroll* harmlessness test. Even had I not considered that the two errors separately undermined Petitioner's right to a fair trial, the three instances of misconduct considered together are egregious.

---

[14]I note that the inquiry into whether the aggregate impact of instances of prosecutorial misconduct caused constitutional error is not the same as whether multiple separately harmless constitutional errors may together create cumulative error sufficient to warrant habeas relief. The latter claim would not be cognizable on habeas review. Although Sixth Circuit precedent supports the proposition that errors which are harmless in isolation may require reversal when considered together, *see United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000); *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir.1983), no United States Supreme Court precedent recognizes the cumulative error doctrine. Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655.

First, all of the remarks were designed to mislead the jury. In the three separate instances of misconduct, the prosecutor variously told the jury to disregard a legally proper defense, used Petitioner's invocation of his right to silence to prove his sanity, and encouraged the jury to rest its decision on sympathy for the victim rather than on the evidence. The prosecutor's argument to the jury denigrating the insanity defense was highly prejudicial, directly suggesting jury nullification of the insanity defense. Similarly, the questioning regarding Petitioner's silence was a blatant violation of the Supreme Court's decision in *Wainwright*, 474 U.S. at 295. Further, while I have held that the prosecutor's remarks regarding Father's Day did not independently rise to the level of violation of the right to a fair trial, the remarks unquestionably were gratuitous and improper. Although the judge generally instructed the jury to not be influenced by sympathy or prejudice, the court declined to give a separate instruction directing the jury to ignore the prosecutor's remarks. I therefore conclude that, while the Father's Day argument did not itself deprive Petitioner of a fair trial, the impropriety of the prosecutor's remarks heightens the egregiousness of the prosecutor's overall misconduct during rebuttal argument and reinforces the determination that the prosecutor engaged in purposeful misconduct that prejudiced Petitioner's right to a fair trial.

Second, the prosecutor's improper actions were pervasive. The prosecutor used two separate types of impermissible argument during rebuttal, both of which were designed to encourage the jury to base its decision on factors other than the evidence. Further, the third prosecutorial action directly and clearly invoked Petitioner's silence as evidence against him on the only question in issue in the case. The actions, therefore, involved more than isolated incidents of misconduct, but instead were part of a broad effort to lead the jury to rely on improper factors in reaching their verdict.

Third, all of the remarks were both intentional and designed to focus the jury away from the evidence of the case. The prosecutor consistently sought to undermine Petitioner's insanity defense by improper means. No basis exists for concluding that any of the actions in question were the result of unintentional misstatement.

Finally, the first three factors are of heightened significance in light of the dearth of evidence of Petitioner's sanity presented by the prosecution. In the absence of substantial evidence rebutting Petitioner's strong evidence of insanity, the prosecutor had little option but to rely on impermissible attacks on the defense, the improper use of Petitioner's silence and the invitation to juror sympathy to obtain a verdict he had done little to prove by evidence. *See Gall*, 231 F.3d at 311. In the face of the limited evidence to support the jury verdict, the prosecutor's repeated improper conduct was highly important.

"Our courts have long recognized that a prosecutor has a strong influence over a jury." *Gravely v. Mills*, 87 F.3d 779, 790 (6th Cir. 1996) (granting habeas relief on prosecutor's repeated reference to Petitioner's exercise of the right to remain silent) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)). As the Supreme Court has summarized:

> [A prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

-68-

*Berger*, 295 U.S. at 88.  In the instant case, the prosecutor faced strong evidence that Petitioner was insane at the time of the killing.  He either did not or could not obtain any expert evidence to the contrary.  As a result, he elected to rely on an attack on Petitioner's exercise of his right to remain silent and to engage in improper argument attacking the insanity defense and appealing to juror sympathy.  The prosecutor's tactics amounted to "foul blows" that, in the absence of evidence of sanity, likely had substantial influence on the jury.

All four factors of the *Carroll* test therefore support a finding that the prosecutorial misconduct in issue was not harmless.  I therefore recommend that Petitioner be granted relief on this habeas ground.

IV.   Ineffective Assistance of Counsel

In his final ground for habeas relief, Petitioner separately raises ineffective assistance of counsel.  The claim is based on counsel's collective failures to object to improper prosecutorial argument and to object to the prosecution's introduction of evidence of Petitioner's invocation of his right to silence.  The Michigan Court of Appeals separately addressed the claim, and this court should consider the claim in its entirety.  *See Hinkle v. Randle*, 271 F.3d 239, 246 (6th Cir. 2001) (separately addressing preserved claim of ineffective assistance of trial counsel, notwithstanding prior analysis of claim in context of procedural default).

I previously have found that counsel's ineffectiveness in failure to object to certain evidence and arguments constituted cause excusing his procedural default of his claim of prosecutorial misconduct based on those incidents.  Those conclusions demonstrate attorney error sufficient to deprive Petitioner of his Sixth Amendment right to counsel.  Moreover, even had those

-69-

claims not independently amounted to a violation of the Petitioner's Sixth Amendment right to counsel, counsel's errors, considered together, unquestionably set forth a Sixth Amendment claim.

To establish a claim of ineffective assistance of counsel, the petitioner must prove that counsel's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687-88. In addressing this claim, the Michigan Court of Appeals again both mischaracterized Petitioner's claims and misapplied Supreme Court precedent:

> The federal and state constitutions guarantee a criminal defendant the right to the assistance of counsel. The constitutional right to counsel is a right to the *effective* assistance of counsel. Appellate counsel, at the motion for a new trial, stated that trial counsel "worked hard and diligently on this case," and the record below confirms that account. Nonetheless, on appeal, Hanna argues that counsel was ineffective because counsel failed to object to the prosecutor's remarks encouraging the jury not to allow Hanna to use the insanity defense as an "avenue of escape." Hanna again argues that it is improper to urge the jury to convict out of fear that a defendant will otherwise be set free and we again observe that no such argument is actually to be found within the statements in question. Instead, the prosecutor urged the jury not to allow a person who deliberately kills another to escape responsibility by claiming insanity. Implicit in the argument was the suggestion that Hanna could, but chose not to, conform to the requirements of the law and thus that the insanity defense was legally inapplicable. A prosecutor enjoys wide latitude in fashioning arguments and may argue the evidence and all reasonable inferences from it. Had defense counsel objected, counsel could have expected little more than minor clarification along these lines. Further, again, to the extent that the prosecutor's statements included improper civic-duty argument, such impropriety was curable by the trial court's instruction that arguments of counsel were not evidence. In this instance, we conclude that defense counsel committed no substantial error resulting in substantial prejudice to Hanna.

> Hanna argues that his counsel failed to object to the testimony that he chose to stand on his right to remain silent. However, as discussed above, the jury could hardly have inferred Hanna's guilt from his decision to terminate his interview with the police when counsel arrived and so advised him. Because Hanna's identity as the killer was not at issue, and his cooperation with defense counsel in declining to speak further to the police bears but little on the defense theory of insanity, counsel had little reason to object. We conclude that Hanna suffered no prejudice in this respect.

-70-

Hanna states incidentally that his counsel failed to object to the prosecution's denigration of the defense during the trial, but offers no examples or record citations to support that factual premise. "A party may not merely state a position and then leave it to this Court to discover and rationalize the basis for the claim." We will not consider this claim of error further. Hanna complains generally that in a post-judgment motion his trial counsel did not cite all instances of prosecutorial misconduct, but again leaves this Court to guess what these other instances may be. We decline to do so for the same reason.

We conclude that Hanna has failed to show that defense counsel's performance was deficient and that, under an objective standard of reasonableness, counsel made an error so serious that she was not functioning as an attorney guaranteed by the Sixth Amendment or that there is a reasonable probability that, but four counsel's errors, the result of the proceedings would have been different.

(MCOA Op. at 18-19 (emphasis in original; footnote citations omitted).) As I previously observed, in addressing the claim of prosecutorial misconduct, the court of appeals misconstrued the nature of Petitioner's argument that the prosecutor's rebuttal argument improperly disparaged the defense of insanity. Here, in addressing the Sixth Amendment claim, the state court came closer to accurately describing Petitioner's claim on appeal. However, the court still failed to appreciate the argument as one denigrating the insanity defense.[15]

As before, the state court disregarded the clear meaning of the prosecutor's argument on its face and recharacterized it as one that merely implies that the jury should find that the defense was inapplicable because the evidence showed that Petitioner was capable of conforming his conduct

---

[15]Indeed, in the third paragraph of the quoted portion of the opinion, the Michigan Court of Appeals rejected as unsupported Petitioner's claim that the prosecutor had impermissibly denigrated the insanity defense. The court's conclusion that Petitioner had waived the issue, however, was based on a statement contained in a summary paragraph of Petitioner's appellate brief, which contained the phrase that trial counsel "did not object to the prosecution's denigration of the defense during trial." (See Pet. Br. on Appeal, 41; docket #33.) The quoted phrase, however, directly follows a two-paragraph argument in the brief that reiterates the basis for the claim first set out in the prosecutorial misconduct section of the brief. Citing cases and quoting the prosecutor's remarks, counsel strenuously argued that the remarks constituted improper denigration of the insanity defense. Nevertheless, based on a phrase in a concluding paragraph, the court of appeals found the claim unsupported in the brief. The court's conclusion undoubtedly was based on its own continued failure to properly characterize the nature of Petitioner's argument. I conclude that the finding of the state court that Petitioner had waived the argument was patently unreasonable.

to the requirements of the law.   The state court's determination reflects an unreasonable understanding of the language of the prosecutor's argument. *See* 28 U.S.C. § 2254(d)(2). The plain meaning of the prosecutor's argument is that a defendant should not be able to claim insanity to avoid responsibility for a crime.  The court's proposed meaning is only tangentially unsupported by the language used.

In addition, as it did in denying relief on Petitioner's objection to the prosecutor's introduction of his silence, the state court improperly concluded that the evidence was not harmful because no question existed as to Petitioner's identity as the killer.  Once again, that determination is contrary to the Supreme Court's holding in *Wainwright v. Greenfield*, 474 U.S. at 295.

Finally, the Michigan Court of Appeals appeared to rest its finding, at least in part, on an overall conclusion that counsel worked hard and diligently on the case, rather than on the specific errors in issue.  The mere fact that an attorney has performed effectively during the majority of a trial does not prevent a finding that counsel provided constitutionally ineffective assistance by making discrete but important errors at trial.   Indeed, claims of ineffective assistance of counsel must be based on discrete errors that undermine a petitioner's fair trial rights.  *See, Strickland*, 466 at 690 (holding that defendant must challenge specific acts or omissions of counsel and court must evaluate whether those specific acts, in light of all of the circumstances, were outside the range of professionally competent assistance).

In sum, I conclude that the determination of the court of appeals on Petitioner's claim that trial counsel was ineffective in failing to object to clear prosecutorial misconduct rested on conclusions that were contrary to or an unreasonable application of Supreme Court precedent.  28

U.S.C. § 2254(d)(1).  I therefore recommend that habeas relief be granted on Petitioner's fourth

habeas ground.

### Recommended Disposition

For the foregoing reasons, I recommend that the Court grant a conditional writ of

habeas corpus, affording the State of Michigan ninety days in which to provide Petitioner a new trial

or release him.


Dated:   August 11, 2005                          /s/  Joseph G. Scoville
                                                  United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections
may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th
Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).